CASE 85.—ELECTION CONTEST BY CHARLES L. SCHOLL
AGAINST HENRY A. BELL AND ARTHUR PETER
AGAINST CHARLES A. WILSON.—May 22.

# Scholl v. Bell
# Peter v. Wilson

Appeal from Jefferson Circuit Court, Chancery
Branch First and Second Divisions.

SHACKELFORD MILLER AND SAMUEL B. KIRBY, Judges

From a decree in favor of defendants in each case,
plaintiffs appeal—Reversed.

1. Elections—Lost Ballots—Substitution.—Where, on the morning of an election, it was discovered that the ballots for certain precincts had been lost or stolen, the county clerk should supply new ones, if possible, in time for the election.

2. Same—Contest—Petition—Right of Contestant.—A defeated candidate may sue to set aside an election on the statutory grounds, though his petition does not show that he himself was elected to the office.

3. Quo Warranto—Title to Office.—Quo warranto cannot be brought against one holding an election certificate by a contestant, the contestee not being a usurper in the office, as required by Civ. Code. Prac., sec. 480.

4. Elections—Statutes.—Where an election contest involves the title to the office of each member of the general council or aldermanic board of the city, the contest must be conducted under Ky. St. 1903, sec. 1596a, subsec. 12, providing for contests in the circuit court of the county where the contestee resides, etc., and not under section 2771, providing that each

board·of city councilmen shall judge of the eligibility and
election of its members, etc.

5. Same—Vacation ·of Election—Fraud—Intimidation—Violence.
—Where the result of a contested election was effected by
fraud, intimidation, bribery, or violence, the Court ·of Appeals
would set it aside, regardless of the contestees's participation
in or knowledge of the fraud or other wrongdoing, under
Ky. St. 1903, sec. 1596a, subsec. 12, providing for election
contests by suit begun in the circuit court, etc.

6. Same—Burden of Proof.—In a proceeding to set aside an
election for fraud, intimidation, bribery, or violence affecting
the result, as authorized by Ky. St. 1903, sec. 1596a, subsec.
12, the burden is on the contestant to show that the wrong-
doing existed to such an extent that it is impossible to deter-
mine who has been elected; but he is not required to show
that he would have been elected, except for such wrongdoing.

7. Same—Disfranchised Voters.—Voters are to be deemed dis-
franchised where persons entitled to vote are denied the right
to do so, by whatever means, and· also where persons are
permitted to vote, but their votes, by reason of fraud, vio-
lence and other wrongdoing, have not been counted at all,
or have not been counted as cast.

8. Same—Contest—Illegal Votes.—The test to be applied in an
election contest, where illegal votes have been secretly
cast, is to see whether the contestant would be elected if
all the illegal votes were deducted from the vote returned
for the contestee.

9. Same—Burden of Proof.—In order that illegal votes should
be deducted from the vote returned for contestee in an elec-
tion contest, it must be shown, either by direct or circum-
stantial evidence, that the votes were in fact cast and counted
for contestee.

10. Same—Illegal Votes—Evidence.—Where illegal votes were
cast by a secret ballot, the voters alone could prove for whom
the ballots were cast.

11. Witnesses—Privilege—Self-Incrimination.—Depositors of il-
legal ballots are protected by the privilege against self-in-
crimination from testifying for whom such ballots were
voted.

12. Elections—Contest—Illegal Ballots—Uncertainty of Election.
—It being practically impossible to prove for whom secret
illegal ballots were cast, such ballots might be relied on to
show the general uncertainty of an election, without proving
for whom they were cast.

13. Same — Result—Proof—Certificates—Ballots.—In an election contest, the result of the election must be shown by the certificate of the election officers, or by the ballots themselves, where they have been preserved and safeguarded as the law directs, and cannot be proved by parol proof of the contents of such ballots.

14. Same—Lost or Destroyed Ballots.—Lost or destroyed ballots cannot be supplied in an election contest, like a lost instrument of writing, for the purpose of counting the vote.

15. Same—Election Certificates—Best Evidence.—While the certificates of election officers are prima facie correct, the ballots themselves, when preserved as the law directs, are tho best evidence of the vote, and will prevail over the certificates in case of a difference.

16. Same — Precincts—Disfranchisement.—Where no election whatever was held in three precincts and in nine other precincts the election officers of one of the political parties attempted to hold the election in places other than those designated, and, removing the poll books to such places, attempted to vote the registration alphabetically, without the presence of the voters, and returned forged certificates, the entire registered vote of such precincts was disfranchised.

17. Same—Force.—Where the polls in a certain precinct were raided by a band of armed men at about the time they should have been closed, and the ballot box was seized, carried off, and the contents destroyed after 187 voters had voted, such voters were entirely disfranchised.

18. Same.—Where, in a certain precinct, the ballots, certificate, stub, and everything connected with the election, save the ballot box, were fraudulently burned before the count had been completed, so that nothing remained but the statements of the election officers as to the condition in which the ballots were at the time they were destroyed, none of them having been counted, the entire precinct was disfranchised.

19. Same—Vote—Forgery of Certificate—Mutilation of Ballots.— Where, in an election contest, all that was presented from one precinct was a forged certificate of election and ballots which on their face bore unmistakable evidence that they had it not only been tampered with, but much mutilated, and it appeared that the certificate and ballots were taken from the election officers by policemen, and while in their charge the certificate was forged and the ballots restamped, the entire registration of such precinct should be considered disfranchised.

20. Same.—During an election the polls of one precinct were

Scholl v. Bell—Peter v. Wilson.

broken into before the count was completed by a band of men, who in the presence of policemen acted in such a threatening manner as to frighten the Republican officers of election, so that they left the polls and were afraid to return. The certificate from such precinct was a forgery, showing 232 votes for one candidate for mayor and 10 votes for his opponent, while the ballots as found in the box showed 136 to 92 for the same candidates. Held, that the voters of such precinct were disfranchised.

21. Same—Delay in Opening Polls.—Owing to a dispute as to the filling of a vacancy occasioned by the nonappearance of a Republican judge in one election precinct, the polls were not opened until between 11:30 and 12 o'clock. Many people had come to vote, but, finding the polls were not open, had gone away. After the polls were opened, people voted constantly until they were closed, after having been open but four hours, when there were from 35 to 75 men standing in line who had not voted, and who demanded their right to do so. Held, that all of the voters who were denied the right to vote in such precinct should be considered disfranchised, and that their number should be determined by deducting the number of those who did vote from the registered vote of the precinct.

22. Same—Illegal Voters.—Where, in one precinct, 76 old men from a charitable institution were voted illegally without first having been required to take the statutory oath, but there was no proof as to how they voted, their votes should be counted as cast.

23. Same.—During an election in six precincts of a city repeaters were openly voted. In some precincts Republican officers of election were driven from the polls by actual violence, and in others by threats of violence, and while absent the polls were in charge of the Democrats and their sympathizers, during which the repeaters were voted. In other precincts the formality of having the repeaters present was dispensed with, and, while the Republican officers of election were being beaten outside the polling place, the ballot box in charge of the Democrats was stuffed. Republican sympathizers in those precincts who protested were clubbed into insensibility or arrested and incarcerated; the police in each instance either participating in the force and violence committed, or refusing to prevent it when it occurred in their presence. Held, that such acts were sufficient to render the election uncertain in such precincts, and to invalidate the entire vote therein.

vol 125—48.

24. Same—Presence of Policemen.—It is : improper to have the polling places in a city dominated and controlled by the city's police force.

25. Same—Result of Election.—Where, if voters in a city who had been disfranchised by force, fraud, and intimidation, had all voted for the defeated candidates, .the latter would have been elected by large majorities, and it was impossible to determine who was in fact elected, the entire election would be declared void.

26. Same—Conspiracy—Evidence.—In an election contest, evidence held sufficient to show a conspiracy between the managers of the Democratic campaign to carry an election by fraud, theft and violence.

27. Officers—Void Election—Filling Vacancies.—Where an entire election in a city was void, and there was a vacancy in all of the offices voted for, the Governor was required by Ky. St. 1903, sec: 3758, to appoint the judge of the county court, all justices of the peace, the mayor of the city, all of the aldermen and councilmen, a judge of the city court, prosecuting atorney for the city court, and three park commissioners, and the judge of the county court was required by section 1526 to appoint the county court clerk, county attorney, sheriff, surveyor, county jailer, county superintendent of schools, county, treasurer, constables and assessor; the mayor being required by sec. 2791 to appoint a city treasurer, city auditor, city tax receiver, and bailiffs of the city court, and the judge of the city court being required by sec. 3932 to appoint a clerk of such court.

28. Officers — Elections—Contest—Rights of Contestee.—Where, in an election contest, the election was found to be wholly void, and that a vacancy existed in each of the offices voted for, each of the contestees, holding until the qualification of a successor, as provided by the Constitution, was required to perform the duties of his office until his successor was appointed and qualified.

ALEX. G. BARRET, PERCY N. BOOTH, LAFON ALLEN, HUSTON QUIN, WM. MARSHALL BULLITT, HELM & HELM, VAN NORMAN, J. B. McCORMICK, PRATT DALE, HELM BRUCE, Counsel for Appellants.

THE LAW OF THIS CASE AND AUTHORITIES.

1. Generally of Fair Elections—The determined purpose of Constitutional Convention, Legislature and Court of Appeals to

secure fair elections.

(a)  Constitution.—Sec. 6.  "All elections shall be free and equal."  Sec. 151.  "The General Assembly shall provide suitable means for depriving of office any person who, to procure his nomination or election, has, in his canvass or election, been guilty of any unlawful use of money or other thing of value or has been guilty of fraud, intimidation or bribery or any other corrupt practices, and he shall be held responsible for acts done by others with his authority or ratified by him."

(b)  Statute—Ky. Sts. (Ed. 1903) sec. 1596a, subsec. 12.  "In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence, in the conduct of the election, that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the Court of Appeals, finally, may adjudge that there has been no election.  In such an event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify."

(c)  Decisions—Fair elections are the "basic principles of republican government" and it is the "determined purpose" of the Court of Appeals to secure them.  (Adams v. Roberts, 119 Ky., 364; Browning v. Lovett, 29 Ky. Law Rep., 692; Orr v. Kevil, 30 Ky. Law Rep.)

2.  Void elections under the law of Kentucky.

(a)  Constitution—An election is not free and equal but is no election and is void if the right to vote is denied "to any substantial extent."  (Com. v. McClelland, 83 Ky., 686; Hocker v. Pendleton, 100 Ky., 726; Early v. Rains, 28 Ky. Law Rep., 415.)

(b)  Statute—An election is void if the effect of the fraud "upon the result is such that no degree of certainty exists as to the fairly expressed will of the electors."  (Stewart v. Rose, 24 Ky. Law Rep., 1759; Wilkins v. Duffy, 114 Ky., 111; Motley v. Wilson, 26 Ky., Law Rep., 1011; Orr vs. Kevil, 30 Ky. Law Rep.)

Authorities Outside of Kentucky Cited by Appellants—Cooley's Const. Lim., 926; McCrary on Elections, secs. 285 and 286.  (Maloney v. Collier, 112 Tenn., 78; Barry v. Lauck, 5 Cold., 588; Howell v. Pate, 119 Ga., 537; Renner v. Bennett, 21 Ohio St., 431; In re Long Island R. R. 19 Wend., 37; Dodge District v. District, 17 Ia., 85; People v. Canady, 73 N. C., 198; Perry v. Whitaker, 71 N. C., 476; ex parte Kennedy, 23 Tex. App.; 80: State v. Williams, 5 Wise, 308; Pennington v. Hare, 60 Minn., 146.)

Cited by Appellees—Kansas cases, Michigan cases.  (Patton v. Coates, 41 Ark., 111.

3.  Parol evidence and "disgraced" ballots not competent to establish the result of an election.

Scholl v. Bell—Peter v. Wilson.

(a) When ballots have been tampered with, or an opportunity has been given to tamper with them, the court must refuse to "consider them in arriving at its judgment." (Edwards v. Logan, 114 Ky., 312; Hamilton v. Young, 24 Ky. Law Rep., 449; Galloway v. Bradburn, 26 Ky. Law Rep., 977; Childress v. Pinson, 30 Ky. Law Rep.; Orr v. Kevil, 30 Ky. Law Rep.)

(b) Parol evidence can not be used to show what the vote was. (Neely v. Rice, 29 Ky. Law Rep., 1142; Browning v. Lovet, 29 Ky. Law Rep., 692; Childress v. Pinson, 30 Ky. Law Rep.)

4. The form of action is proper.

(a) Under the statute a contestant may in his petition state the facts regarding the election and pray in the alternative that he be given the office or that the election be held void. (Wilkins v. Duffy, 114 Ky., 111; Grinstead v. Scott, 82 Ky., 88; Wilson vs. Tye, 29 Ky. Law Rep., 61.)

(b) If the law were otherwise there would be no remedy, for quo warranto will not lie because the contestees are not usurpers. (Civil Code, sec. 480; Stine v. Berry, 96 Ky., 63; Palmer v. Com., 29 Ky. Law Rep., 219.)

Summary and Application of the Law—Where the contestees receive in precincts not disfranchised majorities ranging from 1557 to 3448, and 4610 voters are disfranchised, it can not be told with any degree of certainty what the result would have been and the election must be set aside.

We submit that where the Democrats have a majority of about 1,584 (possibly that reduced to 884), and on the other hand at least 3,898 citizens were deprived of the right to participate in the election—indeed, we think that the number deprived was greatly in excess of that—certainly somewhere from five to six thousand, according to the view that may be taken of the precincts above reviewed, it can not be the law, and it is not the law, that when one candidate has a majority of say about 1,600, and four thousand people are deprived of the right to vote, there has been a fair election. It is not necessary that the Republicans should have obtained all the votes of these disfranchised persons. If the Republicans had received only three-fourths of the votes lost, they would have elected their candidate. There is so much uncertainty existing about this election that it cannot be said that either party was elected, and we ask that the election be set aside and a new election ordered.

A. J. CARROLL, W. M. SMITH, W. W. DAVIES, N. L. GOLD-SMITH, J. C. DODD, HERMAN MORRIS, JOHN L. DODD, attorneys for appellees.

Scholl v. Bell—Peter v. Wilson.

Statement of points made by counsel for appellees and contestees and authorities cited in support thereof.

1. A bona fide contest suit is a condition precedent to the nullification of an election at the instance of a contestant. (Subsec. 12 of sec. 1596a, Ky. Stats.; 21 Ky. Law Rep., 325, Creech v. Davis; secs. 483, 484, 485 Civil Code; 26 Ky. Law Rep., 343, Stack v. Commonwealth; 29 Ky. Law Rep., 71, Wilson v. Tye; 62 Ky. (1 Duval), 48, Leeman v. Hinton; 112 Tenn., 36 to 58, Nelson v. Speed; 140 Cal., 651, Coghlan v. Alpers; 67 S. W. Rep., 434 (Tex.), Compton v. Holmes; secs. 1773, 1786, Spelling on Ext. Remedies; 2 Ala. ,143, State v. Burnell; 18 Fla., 506, Lake v. State; 56 Miss., 543, Harrison v. Greaves; 46 Mo., 531, State v. Boal; 13 Neb., 529, State v. Stein; 29 Neb., 205, State v. Hamilton; 112 Tenn., 74, Johnson v. Brice; subsec. 4, sec. 113, Civil Code; 29 Ky. Law Rep., 369, Langden v. Tennelly; 82 Ky., 253 Rooney v. Tierney; 100 Ky., 375, Alsop v. Central Trust Co.; 98 Ky., 91, Wehmhoff v. Rutherford; 78 Ky., 102, Turnpike Co. v. Maupin; 19 Ky. Law Rep., 694, Black v. Holloway; 112 Ky., 96, Hollingsworth v. Warnock, 112 Tenn, 24; Harmon v. Tyler; 114 Ky., 114, Wilkins v. Duffy.

2. The substantive averments of the petition are to the effect that a valid election was held, at which the contestants were elected to the offices in controversy. (82 Ky., 136, Crowe v. O. & N. R. R. Co.; 12 Bush, 436, Radford v. Ins. Co.; 1 Daniel Chancery Practice, 378; 112 Tenn., 36, Nelson v. Sneed; 112 Tenn., 74, Johnson v. Brice; 112 Tenn., 82, Maloney v. Collier; 118 Ky., 481, Stack v. Commonwealth.

3. The evidence should be limited to the grounds of contest. (29 Ky. Law Rep., 1142, Neely v. Rice; 113 Ky., 699, Bailey v. Hurst; 104 Ky., 699 and 843, Anderson v. Lykins; 15 Ky. Law Rep. 505, Lunsford v. Culton; 104 Ky., 848, Banks v. Surgent.

4. The nature and incompetency of the contestants' evidence touching the issues of non-residents and false impersonations affecting the names set out in detail in their amended petitions. (27 Ky. Law Rep., 914, Ervin v. Benton; sec. 71, McCrary on Elections; secs. 1478 and 1477a, Ky. Stats.; 29 Ky. Law Rep., 695, Browning v. Lovett; 26 Ky. Law Rep., 1013, Motley v. Wilson.)

5. Directory and mandatory provisions of the election law and their effect on this election. (26 Ky. Law Rep., 1013, Motley v. Wilson; 14 Ky., 129, Wilkins v. Duffy; 24 Ky. Law Rep., 579, Napier v. Cornett; 93 Ky., 223, Wooley v. L. S. Ry. Co.; 86 Ky., 600, Varney v. Justice; 85 Ky., 609, Anderson v. Winfrey; 83 Ky., 695, Commonwealth v. McClellan; 28 Ky. Law Rep., 420, Earley v. Raines; 100 Ky., 726, Hocker v. Pendleton; 108 Ky., 307, Taylor v.

Beckham; 24 Ky. Law Rep., 1761, Stewart v. Rose; 30 Ky. Law Rep., —, Childress, &c., v. Pinson, &c.)

6. The legislative adjudications touching the votes in the assailed precincts.

7. The burden of alleging and proving facts sufficient to justify the relief asked rests on the contestants. (26 Ky. Law Rep., 1014, Motley v. Wilson; 24 Ky. Law Rep., 579, Napier v. Cornett; 118 Ky., 485, Stack v. Commonwealth; sec. 491, Meecham on Public Officers; sec. 497, McCrary on Elections.

8. The entire failure of contestants to prove the charge of conspiracy. (29 Ky. Law Rep., 71, Wilson v. Tye; 26 Ky. Law Rep., 1013, Motley v. Wilson.)

9. The adjourned voting places and the precincts in which no election was held and the effect thereof on these contests. 26 Ky. Law Rep., 1013, Motley v. Wilson; 114 Ky., 129, Wilkins v. Duffy; 114 Ky., 228, Combs v. Eversole; 104 Ky., 849, Banks v. Sergent; sec. 497, McCrary on Elections; 1 Brew., 1, Mann v. Casseday; 41 Ark., 611, Patton v. Coates; 20 Pacific Rep., 452, Blue v. Peter; 11 Kan., 308, Russell v. State; 25 Kan., 275, Pruitt v. Stevens; 42 Kan., 120, State v. Malo; 26 Kan., 225, Tarbox v. Sughrue; 42 Kan., 164, State v. Fulton; 98 Mich., 515, People v. Hanna; 16 Mich., 283, People v. Cicott; 99 Mich., 538, Atty. Gen'l. v. May.)

10. Some general comments on the character and conduct of the election and the campaign preceding same.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

These cases involve the validity of the county and city elections held in Louisville and Jefferson county on the 7th day of November, 1905. The entire Democratic ticket was returned as elected, by the final count, by majorities ranging from 3,373 to 5,280 votes. In this election the Democrats were opposed by what was known as the "Fusion Ticket." The Fusion candidates were selected at a Republican convention in which the "City Club" took a prominent part. Some of the candidates so selected had theretofore affiliated with the Democrats, and some were old line Republicans. They all ran under the Republican device. Fol-

lowing the issuance of the certificates of election to the apparently successful candidates, each of the defeated candidates filed a suit contesting his opponent's right to the office. In these suits the grounds for contest relied upon are set out at length, and the petition when read in connection with the exhibits filed therewith, shows in the contestants a right to the offices claimed by them. The prayer is in the alternative; that is, that the contestants be declared duly elected, or, in the event this cannot be done, that the election be declared null and void, because the irregularities and frauds practiced were so great that it is impossible to determine who was elected.

It may not be inappropriate at the outset to say that, following the November election, 1903, there were charges freely made that wholesale frauds had been committed in many precincts in the city; that in some places the ballots were stolen and no election held at all, while in others the polling places had been secretly and illegally removed, and the voters in these precincts deprived of the right to vote, while in still others such acts of violence had been committed that the voters were driven from the polls and prevented from taking part in the election; that following this election many criminal prosecutions were set on foot, but none of them resulted in the punishment of those charged with violating the law. For the alleged purpose of correcting these evils, there was formed what was known as the "City Club," a non-partisan organization, though its membership was largely Republican. This organization, early in the fall of 1905, notified the people, through the newspapers of Louisville, as to how the ballot had been debauched in 1903, and called upon all good citizens, regardless of politics, to join in a movement to secure a fair election.

Scholl v. Bell—Peter v. Wilson.

The campaign of 1905 was remarkable for the bitterness and intensity of feeling which was aroused by the charges and countercharges of fraud and corrupt practices. The first real trouble developed upon registration day. The Fusion candidates charged that a great number of repeaters had been brought into the city for the purpose of being registered and later voted, and to prevent these from registering the Fusion party was very active. Their activity brought on many clashes between their challengers and the Democratic workers, and in some instances the members of the police force took a hand in the controversy in aid of the Democrats. In spite of all effort, there were, as shown by the record, a great many illegal registrations. Voters were registered in many instances over the protests of the challengers. The climax to the excitement connected with registration day was reached when a Republican worker, a young man of high character and standing in the city, was beaten up by a policeman, and other Republican workers, who had cameras for the purpose of taking snapshot pictures of men who were believed to be repeaters imported into the city for the purpose of being registered and voted, were driven by the police from the streets. These troubles on registration day intensified the state of feeling. The Fusion leaders complained to, and called upon, the city authorities to discipline the policeman for the unwarranted assault which he made upon an unoffending citizen, and to discipline others for permitting irresponsible characters to assault reputable citizens and escape. The policeman who had been guilty of this assault was acquitted in the city court, while the man he had beaten up was convicted.

The Republicans and Fusion speakers denounced

in unmeasured terms the conduct of the police on registration day, and condemned the action of the court in punishing the citizens who had dared to assert their rights, and in freeing the policeman who had clearly done wrong. These stump speeches aroused in the police a feeling of resentment against the Fusion party, and to the state of feeling thus brought about counsel for appellees say may be attributed the unauthorized acts of violence committed by some of the members of the police force on election day. The Fusionists caused the registration of the entire city to be published in a daily paper in Louisville, giving the street address of each voter, and again, through the press, called upon the citizens to examine the registration as published, and report any improper or illegal registration. A great many illegal registrations were shown, and the county judge,, on proof heard, ordered the names of 366 persons to be stricken from the registration as having been illegally registered. He refused to strike the names of 670 other persons from the list because they had not 'been served with proper notice. Proof taken since the election shows that, in addition to those stricken from the list, 773 other persons not entitled to vote were permitted to do so, bringing the total of illegal registrations, which are shown to have been made prior to this election, up to 1,829.

Upon the conduct of the election throughout the city an immense amount of testimony has been taken; but the storm center of this contest is confined to 24 precincts, in 16 of which there is practically no dispute at all as to the facts, and not much contrariety as to the facts concerning the other 8. In precinct 13 of the Ninth ward, 25 of the Tenth ward, and 45 of the Eleventh ward no election whatever was held. The

ballots were delivered to the Democratic clerk for each
precinct, and he failed to produce them on the morn-
ing of the election day. In consequence of such failure
on his part, no election was held.   The registration in
these three precincts was as follows:
Precinct 13 of the Ninth ward ............... 225
Precinct 25 of the Tenth ward ............... 271
Precinct 45 of the Eleventh ward ............ 278

774

On the morning of election day the county clerk,
Semonin, was informed by the Fusionists that the
ballots in four precincts had been lost or stolen.   He
took steps to have them reprinted.   He did thus sup-
ply one of the precincts, and the election in this
precinct was regularly held, and of this there was no
complaint.  He was proceeding to have the other three
precincts supplied in like manner, when he was in-
formed by counsel for the Fusionists that he had no
right to thus supply the ballots.   The matter was
then referred to Semonin's attorney, who had a con-
ference with the attorney for the Fusionists, the result
of which was that they concurred in the advice which
the latter had given Semonin, and he therefore did
not supply the ballots for the other three precincts.
In this he was not to blame, as he acted upon the ad-
vice of counsel; but, to prevent similar confusion in
the future, we deem it proper to add that the people
of a district are not to be disfranchised because the
ballots are lost or stolen, if they may still be supplied
by the county clerk in time to hold the election.

In precinct 38 of the Third ward, known as the
"Bergman Street" precinct, the election proceeded
regularly until about the time for the polls to close,
when the voting place was raided by a band of armed

men, the box containing the ballots carried off to the saloon of a prominent Democratic worker,· and the ballots were never seen thereafter. At the time of this raid the stub book, which was all that was left, showed that 187 votes had been cast.

In the following nine precincts, to-wit, precinct 27 of the Sixth ward, and precincts 18, 24, 26, 28, 32, 34, 37 and 38 of the Twelfth ward, the regular polling place was changed, and no election held at the place which had been designated by John W. Green, acting sheriff or elisor, as the place at which the election should be held. In 8 of these precincts there was no pretense whatever made to comply with the requirements of the law as to adjourning from one voting place to another; and while a notice was prepared and directed to be posted, notifying the public that the polls had been changed, in the remaining or ninth place this notice was never posted. In these removed precincts the stub books disclosed the startling fact that the registered voters voted alphabetically, beginning with those whose names commenced with the letter A, and voting in regular order down to Z, or vice versa, all of the A's being voted before any B's were permitted to vote, and all of the B's before any C's, etc.; and this same character of voting is shown by the stub book to have been indulged in in that precinct in which there was an effort made, apparently, to comply with the requirements of the law as to moving it. The polls in each of these nine removed precincts were conducted by Democrats and such assistants as they selected. The regular Republican officers of election were denied the right to participate. The record shows clearly that in each of these precincts, so illegally removed, the ballots were in the possession of the Democratic clerks and the ballot

boxes were in possession• of the Republican sheriffs.
On the morning of election day each Republican
sheriff of election reported for duty at the proper
place in his precinct with the ballot box therefor, and
remained there during the day, and while so stationed
the Democratic clerk in each of these precincts, with
the other Democratic officers and those selected by
them, were holding, or pretending to hold, an election
at another place in the precinct. They were enabled
to do this by reason of the fact that the Democratic
campaign committee had, in violation of an agreement
twice made, supplied these removed precincts on the
night before election with ballot boxes, thereby en-
abling them to violate the law and secretly conduct a
pretended election at a place other than that lawfully
designated. In each of these precincts, thus illegally
and wrongfully removed and improperly officered, the
evidence of fraud is overwhelming. The returns in all
of them were grossly false, and can serve no purpose
in this case, other than to show the bold and bungling
manner adopted by these officers of election to defeat
the will of the people in their respective precincts. In
these nine precincts the Democratic candidates are
given a majority of 1,789 votes out of a registered
vote of 2,770.

In the Twenty-seventh precinct of the Tenth ward
the election proceeded regularly until the polls closed.
During the count a dispute arose, and the Democratic
inspector seized the ballots and threw them into the
fire, and they were burned up. The extent of the dis-
turbance at this time is best illustrated by the fact
that all of the election officers fled precipitately from
the room. In our view it is unnecessary to go into the
question of the cause of this conduct, further than to
say that it was the result of the threatened violence

and intimidation practiced by the inspector. The facts are undisputed that from this precinct there are neither certificate of returns, tally sheet, nor ballots— absolutely nothing but the empty box. Parol testimony was taken to the effect that at the time the ballots were burned there were 12 uncounted ballots, and that the remaining ballots showed 80 for the Republican candidate for mayor and 56 for his Democratic opponent. There is no evidence as to how the ballots were cast for the other candidates. There were 233 registered votes in this precinct.

In the Twentieth precinct of the Twelfth ward, the election was conducted without incident until the polls closed and all of the straight ballots had been counted. A dispute then arose as to how a certain scratched ballot should be counted, and it was agreed to call in a lawyer for each side and let them determine the matter. At this moment a crowd of men, headed by a policeman, rushed into the room and overturned the stove; the policeman knocking the Republican sheriff of election down. The ballots were scattered from the table to the floor. The Republican judge, in whose house the poll was located, went into a rear room, secured two pistols, returned, and temporarily kept the crowd, which had assembled in the room, at bay. Order was presently restored, and the poll cleared of every one except the election officers and inspectors, who proceeded to straighten out the ballots and continue the count; whereupon a patrol wagon drove up, manned by seven policemen, who forcibly entered the poll, arrested the Republican sheriff, gathered up the ballots and ballot box, put them into the wagon, drove to the jail, where they incarcerated the Republican sheriff of election, and thereafter carried the ballot box and ballots to the county clerk's office, where they

were delivered either to the clerk or his deputy. The certificate from this precinct is signed by the two Democratic officers only (neither of whom testifies). It gives for all of the Democratic candidates a straight vote of 202, and 15 for the Republicans. The chancellors found this certificate to be "false and fraudulent." A recount of the ballots in this precinct shows that some are stamped under both emblems, some opposite both mayoralty candidates, and about 100 are stamped under the Republican device and also in the square opposite the name of the Democratic candidate mayor. There is ample ground to justify the conclusion that some one, after the ballots had been carried away in the patrol wagon, stamped about 100 straight Republican ballots in the square opposite the name of the Democratic candidate for mayor, thus giving the head of the Democratic ticket 100 votes that really belonged to his Republican opponent, and then made up a false certificate. In any event, the ballots, as they now appear, are wholly inconsistent with the certificate, which gave the Democrats 202 votes to the Republicans 15 votes.

In the Twenty-fifth precinct of the Twelfth ward, the conduct of the election was without incident until during the course of the count, when a Republican election officer charged that a Democratic inspector, who was calling off the ballots, was not doing so correctly, and demanded a recount. A difficulty arose, and a policeman, who was in the room at the time, left and shortly returned with another policeman. They were followed by about twenty men. These men in a threatening manner crowded around the table where the count was in progress, and the Republican election officers and inspector left the poll, and did not return. They testify that they left because they were afraid

they would be beaten up. The certificate of returns is admitted to be a forgery, and cannot be relied upon. The advantage of the forgery to the persons in whose interest it was committed may be illustrated by the return, which shows 233 votes for the Democratic candidate for mayor and 10 votes for his Republican opponent, while the ballots themselves, when counted, showed 136 to 92 for these same candidates.

In the Twenty-seventh and Twenty-eighth precincts of the Third ward the polling places were across the street from each other, and as the facts connected with these precincts are very similar they will be considered together. At the corner of the streets adjoining the places where the election in these precincts was conducted are two saloons run by local Democratic workers, and these saloon keepers, their relatives, and friends practically took charge of the polls in their respective precincts. In one precinct the Republican sheriff of election was arrested on a warrant for misdemeanor sworn out the day before, and his place filled by the other Democratic officers over the objection and protest of the Republican judge. The Republican challenger was denied the right to enter the polling place until about 10.30 a. m. The Democratic judge was armed. The proof as to these precincts abundantly supports the charge that election repeaters were openly taken from one of these polling places to the other, and voted first in one and then in the other. In this way 47 illegal votes are shown to have been cast. Many of the ballots are mutilated, and the returns from one of these precincts are grossly false. Proof is abundant that the saloon keepers' friends were armed, and were about the polling places throughout the day, pursuing a course of intimidation toward the workers and sympathizers of the Republi-

can party, cursing and abusing them in a most shocking manner, and by this means and by a display of arms voted whom they pleased and as often as they pleased. The police officer stood by and offered no protection to the citizens against these acts of violence. There is no evidence that in these precincts any Republican officer or Republican worker was guilty of any misconduct.

· In the Twenty-eighth precinct of the Sixth ward the policeman who had beaten up the Republican judge of election on registration day was again assigned to duty. Early in the day the Democratic election officers, assisted by this policeman and others, excluded negroes from voting, knocking and shoving them out of line, advanced Democratic voters, and made Republican voters stand back. Persons having no right to vote were admitted into the voting room, and when the Republican judge protested he was assaulted, dragged into the street, and beaten in the presence of the policeman, who refused to interfere, although called upon to do so. Private citizens attempted to arrest persons who were voting without right, and called on the policeman for assistance. This he refused, and they attempted to make the arrests in person, whereupon he rescued the repeaters and turned them loose. These difficulties caused a crowd variously estimated at from 500 to 1,000 people to gather around the voting place, and this excited condition lasted until the polls closed. The polls were in the hands of the Democrats, who had remained therein, while the Republican officers of election were being beaten and ill-used in the streets outside.

In the Eleventh precinct of the Ninth ward 27 illegal votes are proved to have been cast. In this precinct a crowd of armed men forced their way into the polls,

and the police refused to interfere with their doing so, although called upon by the Republican sheriff of election for aid. This was repeated several times. About noon the glass front of the building in which the election was being conducted was broken out, the crowd entered, and with drawn pistols refused to leave until they had voted again. The Republican officers of election were powerless, and the police refused to do anything toward restoring or preserving order. A party of five men—leading business and professional men of the city—appeared about this time, and appealed to the policeman to compel the men who were in charge of the polls to retire from the room and permit the election to proceed. The policeman refused to do so, and about this time a crowd of men, with pistols and clubs, assaulted the party of five; and beat three of them into insensibility. The policeman stood by and watched the assault, making no effort to protect the men who were assaulted. These five men were unarmed, and had been guilty of no offense other than to make a request (if that may be called an offense) to the police to restore order. The Republican sheriff of election in this precinct was armed, and drew his pistol after being struck over the head with a club, and shot a man who was aiming a pistol at him. This sheriff of election was promptly arrested and taken away. While he was absent the polls were in the undisputed charge of the Democrats, and 16 ballots, at least, are shown to have been unlawfully stuffed into the box.

In the Nineteenth precinct of the Ninth ward more that 100 illegal registrations were proved, and the county judge caused 80 to be stricken from the list before election day. In this precinct early in the day armed men entered the polls, dragged the Republican

vol. 125—49.

sheriff into the street, beat him into unconsciousness, and beat up others who came to his rescue, in the presence of a policeman who did nothing. This same band of armed men later in the day returned and again raided the polls, each time leaving the polls in the hands of the Democrats; and while in this condition 20 illegal voters are proved to have voted in this precinct.

In the Twelfth precinct of the Ninth ward, just before the polls were opened, two policemen went into the polling place, dragged the Republican judge out of the polls, cursed and abused him, and finally took him to jail. He was released on bond, but was unable to return. A prominent lawyer protested to the police at such conduct, and he was thereupon arrested and taken to jail. These arrests were made in the presence of the chairman of the board of public safety, who had control of the police, and he not only refused to listen to the appeal of this lawyer for protection, but spoke in an approving manner of the conduct of the policeman. Shortly thereafter the Democratic judge of this precinct arrived, accompanied by three strangers and a fireman. They promptly insisted that the Republican clerk swear in one of their number, a total stranger. He refused to do so, but selected another Republican. This band of men refused to permit the Republican, so selected, to enter the polls; but, because he desired to do so, they caused him to be arrested and taken to jail. The Republican challenger was next set upon and severely beaten over the head, and a prominent business man, who protested, was promptly arrested and taken to jail. The Republican clerk offered to select another man as judge, and he was thereupon assaulted and terribly beaten, his jaw being broken; and the newly selected Republican

judge was assaulted, thrown into the street, beaten into insensibility, and while in this condition carried to jail. The Republican challenger, a promnent lumber merchant, and another leading citizen and an old negro, who happened to be passing, were next arrested and thrown into jail without even a pretense of cause therefor. The sum total of these early morning difficulties was that all of the Republican officers of election were beaten and thrown into jail, and all Republican sympathizers who offered the slightest protest or called upon the police for protection were likewise arrested and thrown into jail, and some of them terribly beaten. So great was the excitement and the reign of terror caused by this conduct of the police and their Democratic associates that the Republicans were unable to find any one to act as clerk, and the Democrats succeeded in having the man whom they first wanted named as clerk to act, and this left them in undisputed control of the polls.

In the Thirtieth precinct of the Tenth ward, one of the Republican officers failed to report for duty, and the other Republican made an effort to fill his place. The Democrats refused to permit him to do so unless he would name a man of their selection, a man unknown to him, and whom he believed to be a Democrat. He declined to agree to this unreasonable demand, and the Democrats refused to permit the polls to be opened. Between 11 and 12 o'clock the election commissioners of Jefferson county were finally sent for, and when they arrived they required the Democrats to permit the Republican to name the man whom he had at first suggested to take the place of the Republican who was absent, and the voting was commenced between 11:30 and 12 o'clock. Many people had come to vote, and, finding the polls were not open, had

doubtless gone away. After the polls were opened the people voted constantly until they were closed, at which time there was a long line standing demanding the right to vote. This line is estimated to have contained from 35 to 75 persons, and the record shows that 167 of those registered in this precinct failed to vote. The polls were open but 4 hours, instead·of 10, as the law directs. This precinct is normally Republican.

In the Twentieth precinct of the Tenth ward, 76 old men were permitted to vote openly and without being required to take the oath, as required by section 1475 of the Kentucky Statutes of 1903. These men were assisted into the voting booths by others who had no right in the room, and while they were being voted all other voters were required to wait; preference being given to these old men. They commenced to vote at 6:15 a. m., and consumed more than three hours in voting. Meanwhile all other citizens were required to wait. A policeman, who was called upon by a citizen to know why all others were denied the right to vote, cursed and abused the citizens, and gave him to understand that he was running the election, and wanted no outside interference.

These are, in brief, the facts relating to the conduct of the election in the 24 precincts in question. Much testimony was taken as to the conditions which existed in other precincts in other parts of the city, but we have not deemed it necessary for the purposes of this case to go into these questions. Charges and counter-charges of fraud and corrupt practices are freely made, and much testimony was taken in an effort to support the same. The Republicans were charged with having attempted to secure, through che Prohibition party, an extra challenger and inspector for each

precinct, the alleged price of this bargain being $100, to be paid to a leading Prohibitionist; that some one connected wth the Republican campaign management had procured a large number of hickory canes or walking sticks, something like 300 in number, to be used in assaults on election day; that a Republican worker, an ex-Democrat, offered to bribe Democratic clerks to destroy ballots or falsify returns, and that he promised to pay so much to each clerk who would enter into the agreement. They were also charged with renting houses conveniently near the polling places and establishing sub-headquarters therein, in which men were assembled for the purpose of taking part in fights, riots, and rows on election day. On the other hand, the Democrats were charged with having conspired to defeat the will of the people in the conduct of a fair and free election, by causing no election to be held in three precincts, by removing to somc secret place the polling places in nine precincts, by stealing and forging the returns in the other precincts referred to, and by police intimidation and violence in others. They further charged that the police were in a conspiracy with the Democrats to register and vote a large number of men not entitled to vote; that many of these were registered at the instance of the police in the homes of policemen and firemen, in houses of ill-fame, in empty houses, and some in vacant lots; and that the Democrats had furnished ballot boxes in order that the precincts might be removed, although they had agreed that they would not do so.

More than 1,825 men are shown by the record to have been registered who had no right to vote. The Fusionists had a campaign fund of more than $20,000, and the Democrats one of $80,000; making a total campaign, or corruption, fund of about $100,000, all of

which was spent. The Democrats claim to have spent $22,000 on registration day; the Fusionists, $6,000 on this same account. The Democrats furnished the ballot boxes that were used in the nine removed precincts, and to this wrong they practically pleaded guilty, as no excuse is offered for it. The police were charged with a guilty knowledge of the illegal registration of many men in the city. Two policemen, against whom specific charges were made of having attempted to plant four repeaters in the home of a poor widow, were placed upon the stand. One of them, when interrogated, stated that, under advice of counsel, he declined to answer, as the answer might tend to incriminate himself The other refused to give any answer save this: "I don't remember," and, when pressed,, he finally said he did not recollect what it was he could not remember. One hundred and eighty fraudulent registrations were shown to have come from the homes of policemen and firemen, and over 300 from houses adjacent thereto. Several of the Democratic clerks, who voted alphabetically the removed precincts at the election, have been given profitable positions of responsibility and trust by those who profited by their wrongdoing. Upon these facts and much other evidence of minor irregularities in the conduct of this election, the chancellors found that, while great frauds and outrages had been perpetrated, appellees were not parties to these frauds; that a great number of voters had been disfranchised because of the fraudulent and wrongful acts, but that the per cent. of those disfranchised, as compared with the total vote, was not sufficient to warrant the court in vacating the election. The suits were dismissed, and plaintiffs (contestants) have appealed.

There were some 44 of these suits tried together in

the lower court, and the chancellors of the First and
Second divisions sat and heard them together. In the
recent years the whole tendency of legislation has
been to so safeguard elections as to remove any ob-
stacle that stands in the way of, or tends to prevent, a
full, fair, and free expression of the will of the people
at the polls. This legislation has been a most fruitful
field for litigation. Our courts have been called upon
to pass upon and interpret every clause of our election
law, and to deal with almost every conceivable viola-
tion thereof; and while no hard and fast rule has been
adopted that can be made applicable to every case that
may arise, yet the following principles governing the
conduct of elections and construing the election law
may be considered as settled:

1. A defeated candidate may bring a su't to set
aside the election upon grounds specified in ...e stat-
ute, even though his petition does not show that he
himself was elected to the office. Grinstead v. Scott,
82 Ky. 88, 4 Ky. Law Rep., 614; Wilson v. Tye, 92 S.
W. 295, 29 Ky. Law Rep., 71; Wilkins v. Duffy, 114
Ky. 111, 70 S. W. 688, 24 Ky. Law Rep. 21, 913, 968.
If the law were otherwise, there might be no way to
void an election which had been carried by the
grossest frauds, because the action of quo warranto
cannot be brought, for the reason that the contestee,
holding the election certificate, is not a usurper. Civ.
Code of Prac. section 480; Stine v. Berry, 96 Ky. 63,
27 S. W. 809, 16 Ky. Law Rep., 279; Palmer v. Com-
monwealth, 92 S. W. 588, 29 Ky. Law Rep., 219.

2. In a case where the contest involves the title to
the office of each member of the general council or
aldermanic board of a city, section 2771 of the Ken-
tucky Statutes of 1903 is not applicable, and the con-
test is properly conducted under section 1596a, sub-

section 12, Ky. Stats., 1903. Bates•v. Crumbaugh, 114 Ky. 447, 71 S. W. 75; Orr v. Kevil, 100 S. W. 314, 30 Ky. Law Rep. 761. In all cases where there is a contest over the seat of a minority of the members of the council, section 2771 applies; but where all, or more than a majority, are contested, then the contest must be by suit in the circuit court, as in a contest over county offices. It never was the intention of the lawmakers that one should be the judge of his own election.

3. Disfranchisement is not the only element that prevents an election from being "free and equal;" for illegal votes, intimidation, and violence may contribute to render an election void under the Constitution. Commonwealth v. McClelland, 83 Ky. 686. It is impossible to state with precision to what extent disfranchisement, illegal voting, etc., must exist in order to deprive the election of the general characteristics of being "free and equal." The language of the Constitution is designedly broad, made so for the purpose of covering and meeting every condition that may arise and every condition that may be invented to prevent the substantially fair and free expression of the will of the people. A combination of two or more of these elements may render an election void, although any one of them, taken alone, might not be, in a particular case, of itself sufficient to have that effect.

4. Under section 1596a, sub-section 12, Ky. Stats., 1903, this court will set aside any election where fraud, intimidation, bribery, or violence affects the result to such an extent that it cannot be determined who was elected. Motley v. Wilson, 82 S. W. 1023, 26 Ky. Law Rep. 1011; Stewart v. Rose, 68 S. W. 465, 24 Ky. Law Rep. 1759; Orr v. Kevil, 100 S. W. 314, 30 Ky. Law Rep. 761; Banks v. Sergent, 104 Ky. 843, 48

S. W. 149. To set aside an election under this statute, two conditions should exist: First, the result must have been affected; and, second, the affecting element must have been fraud, intimidation, bribery, or violence. The contestee's participation in, or knowledge of, the fraud or other wrongdoing does not have to be shown in order to set aside the election. It may be set aside, even though the contestee was entirely innocent of any knowledge thereof, as was expressly decided in the case of Stewart v. Rose, necessarily assumed in Wilkins v. Duffy and Orr v. Kevil, and supported by the opinion in Motley v. Wilson and Browning v. Lovett, 94 S. W. 661, 29 Ky. Law Rep. 692. Creech v. Davis (Ky.), 51 S. W. 428, which holds to the contrary, was decided before the statute, and cannot be said to be an authority under the statute.

5. When it is said that, in order to set aside an election, the fraud, etc. (1) must have "affected the result to such an extent that it cannot be determined who was elected," as decided in Motley v. Wilson; (2) must have "prevailed so that its effect upon the result is such that no degree of certainty exists as to the fairly expressed will of the electors," as decided in Stewart v. Rose; or (3) that there has been such fraud, intimidation, bribery, or violence that neither contestant nor contestee can be adjudged to have been fairly elected (Ky. Stats., 1903, section 159a, subsection 12)—these are all but varying modes of expressing the same idea. The contestant need not show that he would have been elected, except for the fraud. He need only show that the fraud, intimidation, bribery, or violence existed to such an extent that it cannot be determined who was elected.

6. The true test by which to determine whether, under the principles just announced, the result has

been affected in an election—where there has been a fraudulent disfranchisement of voters—is not, would the result have been changed but for the disfranchisement? But, can the court, upon the whole record, determine with reasonable certainty that either the contestant or contestee was fairly elected? By ''disfranchised voters'' must be necessarily meant (1) persons denied the right, by whatever means, to vote; (2) persons permitted to vote, but whose votes, by reason of fraud, violence, or other wrong, have not been counted at all, or have not been counted as cast. Where there was no election whatever in a precinct, we must necessarily hold that all the registered voters in such precinct have been disfranchised. This is certainly the correct rule, in the absence of any proof to the effect that any of the registered voters were illegal voters, ill, or absent from the State on election day.

7. The test to be applied, where illegal votes have been secretly cast, is to see whether the contestant would be elected if all of the illegal votes are deducted from the contestee's vote. Banks v. Sergent, 104 Ky. 843, 48 S. W. 149, 20 Ky. Law Rep., 1024.

8. In order to deduct illegal votes from one party's vote, it must be shown that the votes were in fact cast and counted for such party. Duff v. Crawford, 124 Ky. 73, 97 S. W. 1124, 30 Ky. Law Rep., 324; Combs v. Combs, 97 S. W. 1127, 30 Ky. Law Rep. 161. But it may be shown for whom they were cast, by either direct or circumstantial evidence. Tunks v. Vincent, 51 S. W. 622, 106 Ky. 829, 21 Ky. Law Rep. 475.

9. In the case of illegal votes cast by secret ballot, the voters alone can prove how the ballots were cast, and, as they are protected against such disclosure by the privilege against self-incrimination (Tunks v. Vin-

cent, supra), it is practically impossible to show for whom secret illegal ballots were cast. Consequently they may be relied on to show the general•uncertainty of an election, without proving for whom they were cast. Banks v. Sergent, supra. As to illegal votes cast openly, the plaintiff may, and must, prove by the election officers for whom they were cast; and the only use that can be made of such illegal votes is to deduct them from the vote of the party for whom they were cast, when that fact is shown. Browning v. Lovett, supra.

10. The result of an election cannot be established by parol proof. It must be shown by the certificate of the election officers, or by the ballots themselves, where they have been preserved, safeguarded as the law directs. The contents of ballots cannot be proved by parol. Neely v. Rice, 123 Ky. 806, 97 S. W. 737, 29 Ky. Law Rep. 1142; Browning v. Lovett, 94 S. W. 661, 28 Ky. Law Rep., 692; Anderson v. Likens, 104 Ky. 699, 47 S. W. 867, 20 Ky. Law Rep. 1001; Childress v. Pinson, 100 S. W. 278, 30 Ky. Law Rep. 767. Neither can a lost or destroyed ballot be supplied, like a lost deed or other lost instrument of writing, for the purpose of counting the vote.

11. The certificate of the election officers is prima facie correct; but the ballots themeslves, when preserved as the law directs, are better evidence of the vote than the certificate, and must prevail where there is a difference. Edwards v. Logan, 114 Ky. 312, 70 S. W. 852, 75 S. W. 257, 24 Ky. Law Rep., 678; Hamilton, Jr. v. Young, '87 S. W. 682, 26 Ky. Law Rep. 447, and Browning v. Lovett. But if the ballots are not so preserved, the certificate must control. Galloway v. Bradburn, 119 Ky. 49, 82 S. W. 1013, 26 Ky. Law Rep. 977. If there is no certificate from

a precinct, or no valid certificate, as where it is proved
to be a forgery, and if the ballots therein have not
been propeily preserved, the result of the election at
that precinct cannot be established at all, because
parol proof is incompetent and the precinct is there-
fore wholly disfranchised.

12. The ballots cannot be resorted to, either for the
purpose of contradicting the certificate or of supply-
ing the place of the certificate, where there is none,
if it appears "that the ballots have been changed, or
so exposed as to afford opportunity to be tampered
with, or left in the custody of an officer or other per-
son, so personally interested in the result of the elec-
tion as to be subject to the temptation or inducement
to tamper with them;" for in such event "they lose
their presumptive integrity, and are no longer to be
accepted in a contest or judicial inquiry as to the re-
sult of the election." Hamilton v. Young, Edwards
v. Logan, Browning v. Lovett, Neely v. Rice, Galloway
v. Bradburn, and Childress v. Pinson, supra. If, un-
der these principles, neither certificate nor ballots can
be relied upon, the precinct stands distranchised; for
the result of an election cannot be left to be estab-
lished by the parol testimony of election officers or
other witnesses to the count.

Applying these now well-established principles to
the facts in the case before us, we find that no difficulty
is presented in determining that the entire registered
vote of the 3 precincts in which no election was held,
and the entire registered vote in the 9 precincts which
were unlawfully removed and voted alphabetically,
was disfianchised. The registered vote in these 12
precincts was 3,544. Had the election been conducted
in these precincts at the appointed polling places, by
the proper officers, and in a lawful manner, these

3,544 citizens would have had an opportunity to vote; and as they were denied the opportunity, no other course is open to us but to say that, because of the wrongful and fradulent acts in the three precincts above mentioned, in which no election was held, and by the wrongful and fraudulent acts of the Democratic officers of election in the nine removed precincts, the entire registered vote thereof was disfranchised.

We come next to a consideration of the Thirty-eighth precinct of the Third ward, known as the "Bergman Street" precinct. In this precinct 187 voters had cast their votes, and about the time the polls should have been closed they were raided by a band of armed men, the ballot box seized and carried off, and its contents destroyed. These 187 men were as thoroughly and completely disfranchised as though they had been denied the right to vote at all. They had cast their votes, but were denied the right to have them counted. In the Twenty-seventh precinct of the Tenth ward the ballots, certificate, stub, and everything connected with the election, save the ballot box itself, were burned up before the count had been completed. We have nothing left but the statements of the election officers as to the condition in which the ballots were at the time they were destroyed. They had not all been counted. It is true that most of them had been separated into two piles. One of these piles represented the straight Democratic votes; the other, the straight Republican votes. There were 12 disputed ballots. No one knows, or pretends to say, how these disputed ballots were voted, or for whom they should have been counted. It is now a well-settled rule that the certificates, where there is one, furnishes the means of determining the result of an election in a precinct. In the absence of a certificate, the ballots

themselves furnish the evidence, if it is found that
they have been preserved as the law directs. But in
the absence of both certificate and ballots there is
nothing left by which we may determine the result of
the election in the precinct; and therefore the total
registered vote of this precinct must be considered as
disfranchised, and the 233 voters were, by the unlaw-
ful act of the Democratic inspector, deprived of the
right to vote. In the Twentieth precinct of the Twelfth
ward all that is presented to the court for its consid-
eration is a forged certificate of election, and ballots
that on their face bear unmistakable evidence that
they have not only been tampered with, but much
mutilated. This certificate and these ballots were
taken from the officers of election by policemen, and
while in their charge the certificate was forged and
the ballots tampered with to such an extent that it
would be a travesty upon justice to say that, as pre-
sented to the court, they express the will of the voters
in that precinct; and these 232 voters were, by the
wrongful, illegal, and unauthorized acts of the police
and their aiders, disfranchised. In the Twenty-fifth
precinct of the Twelfth ward, before the count was
completed, the record shows that the polls were broken
into by a band of men, who, in the presence of police-
men, acted in such a threatening manner as to frighten
the Republican officers of election to such an extent
that they left the polls and were afraid to return. The
certificate in this precinct is clearly a forgery, found
so by the chancellors, and practically admitted to be
so by the contestees. This certificate shows 233 votes
for one candidate for mayor, and 10 votes for his
opponent, while the count of the ballots, as found in
the box, shows 136 to 92 for these same candidates.
It may be admitted that the ballots in this case were

not substituted or tampered with in any way, and that nothing worse than a forged or false certificate was made up; but they were, by the wrongful and illegal acts of the policeman and those associated with him, left in the hands of men whose conduct caused the Republican officers of election to leave the polling place, and thereby leave the ballots in charge of men, some of whom were guilty of forging the certificate which was returned from this precinct. It is no stretch of the imagination to conclude that the same persons who would be guilty of such forgery would likewise be guilty of tampering with the ballots themselves, the opportunity being given to do so. Clearly in this case the conduct of the policemen and their associates was such as makes the conclusion unavoidable on our part that their purpose in breaking into this polling place was to perpetrate a fraud. They succeeded in doing this by returning a forged certificate, and, as the ballots were taken from the officers of election by the men who committed the forgery, they do not come from such hands safeguarded as the law directs, and they cannot and should not be considered in determining the result of the election. We therefore conclude that these 243 votes were, by the wrongful, fraudulent, and illegal acts above enumerated, disfranchised. To the 3,544 voters disfranchised because of the fact that they were not permitted to vote, we must, therefore, add the 895 in the four precincts last enumerated, who, though permitted to vote, were denied the right to have their votes counted and certified as the law directs.

We come next to a consideration of the precincts in which the polls were not opened until about noon, and in which, at the time the polls closed, there were from 35 to 75 men standing in line demanding the right

to vote. The voters in this precinct, because of the wrongful and illegal conduct of the officers of election, were given but 4 hours in which to cast their ballots, when the law provides they should have 10 hours. If the voters in this precinct, who were thus denied the right to vote, had been prevented by forcible means from casting their ballots, it would unquestionably be held that they had been disfranchised. In the case before us they were, by peaceable means, denied the right to vote. The Constitution does not look to the means employed, but to the end accomplished. It is immaterial how the voter is disfranchised; the inquiry being alone, was he disfranchised? Had these officers of election opened the polling place at the appointed time, 6 o'clock in the morning, and permitted it to remain open until 10 o'clock, then closed the polls, certified the result up to that time, and refused to permit any one to vote thereafter, certainly it would be held that all who had a right to vote in that precinct and who did not vote at the time the polls were open were disfranchised. It is immaterial whether the polls be closed 6 hours in the forenoon or 6 hours in the afternoon, if the closing has resulted in preventing citizens entitled to vote from doing so. One hundred and sixty-seven men, citizens who were entitled to vote in this precinct, failed to do so, and the proof conclusively shows that at the time the polls closed, at 4 o'clock in the afternoon, from 35 to 75 of these were standing in line demanding an opportunity to vote. How many appeared and applied to vote in the forenoon, and left because they were denied the right to do so, the record does not show, nor is there any means of ascertaining. We are therefore of opinion that the only correct rule to apply to a case of this kind is to say that, where the polls have been closed

by the wrongful and illegal, if not fraudulent acts of partisans of the successful candidates; we will consider as disfranchised all of the voters of the precinct who were denied the right to vote, and their number must be determined by deducting the number of those who did vote from the registered vote of the precinct. This makes 167 disfranchised in this precinct. In precinct 28 of the Tenth ward it is shown that 76 old men were voted illegally; that is, they were voted openly without first having been required to take the statutory oath. The fact that other voters were required to wait while these men voted furnishes no grounds of complaint, if they were entitled to vote. All the voters of a precinct cannot vote at the same time, and, while the laboring man and the business man may, and perhaps would, feel that an old man, who is not engaged in business, and who could not labor, should be required to give way to one whose pursuit or occupation in life renders his time for voting necessarily limited, yet we are not prepared to say that this line of reasoning is correct, or in harmony with the spirit of the times. Old age should be respected, and we are rather of the opinion that the old men were entitled, not as a matter of law, but as a matter of courtesy, to be permitted to vote first. These old men were brought in from a charitable institution. It is doubtless true that many of them, if the oath had been administered, would have been unable to properly stamp his ballot. Still the fact that this may have been true does not authorize or warrant the officers of election in their failure to comply with this provision of the law; and in permitting these old men to be voted openly, without having first required them to take this oath, they permitted this many votes to be cast illegally. The record does not show for whom

they voted, although circumstances are such as to lead
to the conclusion that they voted the Democratic
ticket; but, in the absence of proof to this effect, their
votes should be counted as cast. The police officer in
charge of this precinct, however, was guilty of conduct
which was calculated to intimidate the voters, and
thereby prevent a fair and free election; but, while
the record shows that there were some illegal votes
cast in this precinct, yet it does not justify the conclu-
sion that the irregularities were of an extent sufficient
to warrant the court in declining to consider the result
of the election as shown by the returns from this
precinct.

For convenience the remaining six precincts may be
considered together. An analysis of the condition of
affairs in these precincts discloses the fact that many
persons voted who had no legal right to do so. They
voted over the protest and objection of the representa-
tives of the Republican party at the polls. The plan
adopted to. vote these repeaters is, by the record,
shown to have been two-fold. In some precincts the
Republican officers of election were driven from the
polls by actual violence, and in still others by threats
of violence, and while they were absent, and the polls
were in charge of the Democrats and their sympa-
thizers, men who have been shown by the proof in this
case as not being entitled to vote were permitted to do
so—not once only, but in some instances several times.
In other precincts the formality of having the repeat-
ers present was dispensed with, and, while the Repub-
lican officers of election were being beaten and mal-
treated outside the polling place, the ballot box, left
in charge of the Democratic officers, was being stuffed.
The result in each instance was that fraudulent and
illegal votes were placed in the ballot box. The exact

extent to which this was done cannot, with accuracy,
be ascertained; but the proof shows that a great many
such illegal votes were cast in these precincts. These
illegal votes to an extent invalidate and render uncer-
tain the result of the election therein. Not only is this
true, but the means employed to enable these fraudu-
lent votes to be cast were such as were, of themselves,
calculated to render the result of the election uncer-
tain. Not only fraud, but force and violence, will
likewise render the result of an election uncertain,
when it is practiced to sufficient extent. In the pre-
cincts with which we are dealing the outrageous mis-
conduct of the Democratic sympathizers and workers
and the police beggars description. Republican officers
of election were, without excuse, dragged from the
voting places and terribly beaten. Others who at-
tempted to take their places were submitted to similar
treatment, until in some places no one could be found
who was willing to undertake to act as an officer of
election, and the Democrats were thus enabled to fill
the places of those who had thus been illegally and
wrongfully driven from their post of duty. Nor is
this all. Republican sympathizers who offered to
raise a protesting voice at these outrages were in some
instances clubbed into insensibility, and in others ar-
rested and incarcerated in jail. These acts of violence,
these exhibitions of cruel and inhuman treatment, cer-
tainly had a tendency to, and doubtless did, drive
many timid voters from the polls, and all such were
thereby disfranchised. Still another element that
tended most strongly to render the result of the elec-
tion in these precincts uncertain was the presence and
conduct of the police in and around these polling
places on election day. The statute has designated
the persons who shall have charge of the conduct of

an election, and the members of the police force are
not included among their number. We know of no law
which demands, or even justifies, their participation
in the conduct of an election, nor has the able counsel
for the contestees referred us to any.

The conduct of an election under the supervision of
either military or police authority has never been
sanctioned by our courts, nor approved by our people.
On the contrary, whenever the occasion has presented
itself, it has been uniformly held that an election con-
ducted under the supervision of the military power is
not a "free and equal" election; and the record in this
case shows that the conduct of an election under police
supervision is not less repulsive. In a contest for the
high office of Governor, conducted before the legis-
lature of this state, the entire vote of the city of
Louisville was disfranchised because of the unauthor-
ized presence of the state militia in the city on that
day, although they did not move through the streets
until three hours after the polls had closed. This is
an extreme case, we admit, and it is cited only for
the purpose of showing the degree of public disfavor
with which our people looked upon the use of the
militia in the conduct of the election. The legisla-
ture held that their very presence in or near the city
on the day of the election was calculated to awe and
intimidate the citizens, and by this means prevent a
free and fair expression of the will of the people
at the polls. In our opinion, it is more objectionable
to have the polling places dominated and controlled
by a partisan police than it would be to have the
militia mobilized in a city in which an election is being
conducted. Under the circumstances which the proof
shows to have existed in these six precincts—the force
and violence used by partisans under the protection

of the police; the pernicious activity of the police themselves in and about the polling places, coupled with the large number of illegal votes shown to have been cast—we are led to the inevitable conclusion that a "free and equal" election, within the meaning and spirit of the Constitution, was not held, and the result of the election, as shown by the returns from these six precincts, cannot be considered in determining the result of the election, and the registered voters of these precincts must for the purposes of this contest, be considered to have been disfranchised. The registered vote for these precincts is shown to be 1,686. This makes the total number of voters disfranchised 6,292.

The Democratic majorities, as reported in final count, ranged from 3,373 votes, the lowest majority, to 5,280 votes, the highest. There was included in these majorities the 1,789 fraudulent votes returned from the nine removed precincts, 597 majority from the six precincts which we considered together, and a majority of 43 returned from the Twenty-fifth precinct of the Tenth Ward; hence, leaving out of consideration all fake majorities returned from the precincts which were disfranchised, and the 16 votes given the Republicans by the chancellors in the Twentieth precinct of the Twelfth Ward, the real Democratic majorities range from 960 votes to 2,867 votes. It is readily seen that, if the disfranchised voters had all voted for the defeated candidates, they would have been elected by majorities ranging from 3,425 votes to 5,332, or, in other words, measured by the test adopted by this court in construing the Constitution, this election was not "free and equal," and, viewed in the light of the statute, we are forced to

the conclusion that from the record before us it is impossible to determine who was elected.

The efforts of the Fusionists to secure the challengers and inspectors of the Prohibition party was a piece of sharp practice not to be commended. Had it been successful, it would have given them an unfair advantage over their Democratic opponents—a power in the polling places not contemplated by the statute. The purchase of the hickory canes and the establishment of subheadquarters in different parts of the city, where men were held in readiness to answer any emergency call, were likewise acts which do not meet with our approval. The Fusionists were demanding a fair election. The use of force and violence at the polls does not tend to secure such, but, on the contrary, rather. to defeat it. Men do not attend a peace conference addressed in military attire, neither should they seek to conduct a constitutional election by any other than a constitutional means. No man was assaulted with any of these canes, nor is any one who was quartered in any of the subheadquarters charged with any violation of the law whatever; but, even though this be true, the knowledge on the part of the public that these canes had been purchased and these subheadquarters established was of itself, calculated to inflame and excite the public mind—to create in the minds of the timid the fear that trouble might arise at the polls, and probably deterred them from going to vote; and to this extent these acts of the Fusionists tended to prevent the holding of a fair and free election.

The effort of a Republican to bribe Democratic clerks, while unsuccessful, deserves the severest condemnation, and serves aptly to show how dangerous and deadly an enemy to a free ballot is a large cam-

paign fund, when placed in the hands of dishonest or unscrupulous men. The Fusionists are charged with leveying a tax upon federal office holders; the Democrats, with having exacted tribute from county and city officials. Each charge is true, and neither is to be commended for having done so. The great illegal registration, as shown by this record, and the other illegal acts committed on election day, are, without doubt, the fruits of the improper use to which this enormous campaign fund was put. All of these additional facts and circumstances strengthen us in the conclusion, already reached, that this election was not "free and equal."

Having set forth in detail the facts with reference to the manner in which the election was held, we will now examine into the question of the charge that there was a conspiracy on the part of the managers of the Democratic campaign to carry the election by fraud, theft, and violence. For this purpose it will be necessary to deal with only two or three groups of the material facts, and of these only such as are not in dispute will be used.

The first of the groups which we propose to make available is what is called in the record "alphabetical voting." It should be borne in mind that by law the officers of election must be legally divided between the respective political parties. Where, as in the case at bar, there are only two parties, this is a very simple proposition. Each gets a judge, one gets the clerk, and the other the sheriff of election. When the election material is distributed on the day before the election, the ballots, registration book, and all of the paraphernalia of election, except the box and the booth, are given to the clerk. The ballot box is given to the sheriff, and the booths are distributed by the

county sheriff, or, in this case, by the elisor. It is,
obvious that, to vote a precinct alphabetically, or,
in other words, to hold a "fake election," it was indis-
pensable to have the official ballots and the registra-
tion book. Now, for the Democrats to do this success-
fully, it was necessary to operate in those precincts
where there were Democratic clerks; and in every one
of the large number of precincts where this peculiar
brand of fraud was admittedly practiced the clerks
were Democrats. Of course, as the ballot boxes in
these precincts were in the possession of the Repub-
lican sheriffs, the fraud could not be carried out with-
out the adoption of some expedient which would ren-
der the possession of the official boxes unnecessary.
Each of the two parties owned primary ballot boxes,
which were somewhat similar to the official boxes. It
had been charged by the Republicans, several days
prior to the election, that the Democrats intended to
use their primary boxes in lieu of the official boxes in
certain precincts, so as to dispense with the presence
of the Republican sheriffs and judges, and thus enable
the Democratic officers at these precincts to hold a
false election, by stamping the ballots as if cast reg-
ularly, and entering on the stub book the names of
the voters copied from the registration book. The
Democratic campaign committee denied these charges,
and explained the coincidence of having a large num-
ber of their primary boxes at a certain tin store for
repairs, long after the primary was over and just on
the eve of the official election, by saying that they
were fearful that some of the official boxes might be
missing on the day of election (this sometimes hap-
pens by reason of ignorance or inadvertence), and
they were desirous that such a casualty should be at
once repaired by supplying the missing box or boxes

with their primary boxes. But the Fusionists were uneasy and suspicious, and the final result was that a solemn agreement was made that neither side should, under any circumstances, deliver a primary box to any one but to the elisor (who had, and deserved, the confidence of both sides) in person, never upon what purported to be his order. If this agreement had been kept by the Democrats, it would have been impossible for the false elections in the nine precincts, where 2,770 voters were disfranchised, to be held. This record now shows without dispute that the Democratic campaign committee deliberately violated that agreement by secretly giving orders to their ward and precinct captains for practically an unlimited number of their primary boxes; and it is now conceded that in every instance, where one of these "fake elections" was held and the ballot box stuffed with forged ballots, the box used was one of these Democratic primary boxes given out in violation of the solemn pledge made to their opponents, thus bringing to pass the worst fears of the Fusionists, that what had been conceived in sin would be brought forth in iniquity. Now, in each of these nine precincts the Democratic election officers went to some place other than the regular voting place—sometimes in a cellar, sometimes in the back room of a saloon, or other secret place—and there tore the ballots from the stubs, stamped them as if voted for the straight Democratic ticket, stuffed them in the box improvised as above set forth, then wrote the names of the voters on the stub book. Copying the names alphabetically from the registration book, and forged a certificate, which they returned to the county clerk's office at night, as if all was genuine and regular. During all of election day the Republican officers remained

at the regular voting places, unable to hold an election, and ignorant of the whereabouts of their Democratic co-officers.

In order to fully understand what is meant by "alphabetical voting," it must be recalled that the registration of the voters is kept in alphabetical order; that is, all the voters whose names commence with A are on the first page; all those commencing with B are on the second page, and so on down the alphabet. When the fraudulent elections were held, those in charge of them commenced at A, and voted the names in the order in which they were registered; overlooking the fact that the voters would not come to the polls in the order in which their names were registered, and that a man whose name commenced with Z would just as likely apply for the first ballot on the morning of the election as a man whose name commenced with A. They seemed to be oblivious of the fact that, on the doctrine of chance, the voters would be no more likely to come to the polls in the order of registration than (as was aptly said in argument at bar) if one should throw the Greek letters into the air they would by chance fall so as to spell out the Iliad. To accomplish this fraud in the systematic manner in which it was performed, nine Democratic clerks would have to consent in advance to secretly take the voting paraphernalia to places other than the regular voting place. This was done. It was necessary, in advance, to provide other ballot boxes to supply the lack of regular boxes in the hands of the Republican sheriffs of election. This was done by the orders given by the Democratic campaign committee, who, in violation of a solemn agreement not to do so, gave orders to certain ward and precinct captains for the primary boxes used by the election

officers, as above stated. It was necessary that these boxes should be delivered at the several selected places for holding the false election before the opening of the polls on election day. This was done by the boxes being delivered between midnight and 4 o'clock on the morning of election day. In each instance there was a man, or men, at the place to receive the boxes. Each box was labeled in advance with the number and name of precinct at which it was to be used. It is, of course, obvious that these minute arrangements of detail could not have been made in advance without an agreement. Nor is there room for the thought that it was a provision against the failure of the Republican sheriff to come with the boxes; for, unless endowed with the gift of prophecy this could not be anticipated, and, as a matter of fact, every Republican sheriff was promptly on hand at the proper voting place with the regular ballot box. So that it admits of no sort of doubt that the fraudulent scheme by which ''fake elections'' were held in nine election precincts, and 2,770 legal voters entirely deprived of the opportunity to vote, was carried out by the Democratic officers of election with the aid of the Democratic campaign committee afforded as above stated. These outrages the attorneys for the contestees say in their briefs, and said on the oral argument, are without any justification or excuse, and yet none of the perpetators have been punished; but, on the contrary, several of them retain high office bestowed by the beneficaries of this nefarious work.

The testimony shows many outrages and crimes done by the police, and yet, when these men were placed on the witness stand and interrogated as to what they knew, they invariably sheltered under the

law forbidding self-incrimination; and, when the
question as to whether the witness should or not be
compelled to answer was certified to the chancellors,
the witnesses were always protected by the ruling.
Assuming the ruling to be correct, the conclusion
which seems to have been drawn as to the innocence
of the officers is not justified. The principle under
discussion is a rule of evidence, to protect the witness
from criminal prosecution or public exposure to
shame because of his own testimony. It is a rule of
necessity, beyond which it should not be extended.
Its use should not be considered as affording the
witness a certificate of good character. Here were
police officers being interrogated as to existence of
crimes they were paid to prevent, if possible; if not,
to expose and punish afterwards; and yet they one
and all refused to answer "under advice of counsel."
Suppose a secret murder had been committed, and
the police on that beat, when asked about it, should
say, "I decline to answer for fear of incriminating
myself." This, under the rule invoked, would pro-
tect the witness from answering; but how long would
it justify his retention on the roll of the police? What
would be thought of those who left the public safety
in his hands longer than it would require to discharge
him? Suppose a bank had been robbed, and the book-
keeper, the teller, and cashier, when interrogated,
should say, "I decline to answer under advice of
counsel." What would be thought of a board of
directors who would afterwards leave the bank in the
hands of such men? This is precisely the situation
here. Peace officers, whose duty it was to prevent
and expose crime, when called on to do so, sheltered
under the rule against self-incrimination; and yet
these men still wear the official uniform, still draw

salaries from the public purse, and this is made possible only by the consent of those who are the apparent beneficaries of their silence.

We need not repeat here the many acts of violence, fraud, and intimidation so fully set forth in a former part of this opinion. It is sufficient to say that every note on the gamut of election crimes was sounded on election day by those whose sworn duty it was to prevent it. If these undisputed facts do not establish the conspiracy charged, then we are at a loss to know how such a charge could be established. The conspiracy to steal the election in question•is as plain as was the conspiracy charged in the Declaration of Independence against king and council to rob the colonies of their liberty. After setting forth the reasons against a people changing their form of government for light and transient causes, it is said in that noble instrument: ''But when a long train of abuses and usurpations, pursuing invariably the same object, evinces, a design to reduce them under absolute despotism, it is their right, it is their duty, to throw off such government and to provide new guards for their future security.'' As there, so here. A long train of abuses and usurpations, pursuing invariably the same object, evinces a design to deprive the people of Louisville of their right to elect their own officers, and it is now our duty to overthrow this design, and to declare the safeguards necessary for the future security of the rights of the people. We cannot feel that our duty in this case is fully performed without insisting that it is absolutely necessary for the preservation of a democratic form of government that the right of suffrage should be free and untrammeled. No people can be said to govern themselves whose elections are controlled by force, fraud, or fear. And

the people who do not govern themselves are slaves. No people are wholly beyond the pale of hope until they have lost the right to govern themselves. A free people may be ignorant, but into that darkness the lamp of learning will send its illuminating rays. They may be wicked and depraved, but the voice of virtue will pierce the walls of error and uplift their hearts. They may be unjust and tyrannical, but duty and patriotism will lead them back to the old paths of rectitude and peace. But those whose liberty is in the hands of greedy and rapacious fraud, or cruel and overbearing force, are beyond the reach of learning's lamp, the admonition of virtue, or the voice of patriotism. No people are wholly civilized where a distinction is drawn between stealing an office and stealing a purse. No truly honest man will be satisfied with an office to which his title is not as valid as that to the homestead which shelters his family; and to him who knowingly holds an office obtained by fraud, force, or chicane will ever be applied the language of the dramatist to a usurper of old, "Now does he feel his title hang loose about him, like a giant's robe upon a dwarfish thief."

In bringing to an end this branch of our opinion, in which we have set forth the necessity which constrains us to reverse the judgment of the chancellors, we adopt the following excerpt from the closing sentence in their opinion as a full and accurate resume of the facts of this controversy: "In conclusion, we will say that the methods employed in many of the precincts in this registration and election cannot be too severely condemned. They are abhorrent to the spirit of our civilization and government. * * *"

The result at which we have arrived is so far-reaching in its effect upon the municipal and county

governments involved that, to prevent disorder and confusion, we deem it necessary to decide and say how the vacancies shall be filled. The statute provides that, in case it is adjudged there has been no election, the office shall be deemed vacant with the same legal effect as if the person elected had refused to qualify. It follows that, when judgment has been entered in the circuit court as directed herein, the offices will become vacant, and the vacancies must be filled as though the incumbents had then resigned. Every office involved herein must be filled by appointment as follows: The Governor, under section 3758 of the Kentucky Statutes of 1903, must appoint the judge of the county court, all justices of the peace, a mayor for the city of Louisville, all of the aldermen and councilmen for the city of Louisville, a judge of the city court, prosecuting attorney for the city court, and the three park commissioners. The judge of the county court, under section 1526 of the Kentucky Statutes of 1903, must appoint the county court clerk, county attorney, sheriff, surveyor, county jailer, county superintendent of schools, county treasurer, constables, assessor and coroner. The mayor, under section 2791 of the Kentucky Statutes of 1903, must appoint a city treasurer, city auditor, city tax receiver, and bailiffs of the city court. The judge of the city court, under section 2932 of the Kentucky Statutes of 1903, must appoint a clerk of the city court. Each of the contestees, who by the Constitution holds until the qualification of his successor, will discharge the duties of his office until his successor is appointed and qualified.

For the reasons given the judgment of the lower court in each case of the foregoing cases is reversed and remanded, with instructions to the trial court to

enter a judgment in each of these cases declaring the election of November 7, 1905, null and void, and each of the offices involved in this contest vacant.