Edwards v. Logan.

CASE 38—ELECTION CONTEST BY M. M. LOGAN AGAINST E. W. EDWARDS FOR COUNTY ATTORNEY.—DEC. 9.

## Edwards v. Logan.

APPEAL FROM EDMONSON CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS. REVERSED.

ELECTIONS—CONTEST— PRESERVATION OF BALLOTS— CERTIFICATES— VOTERS—EVIDENCE—IDIOTS—INSANE PERSONS—QUALIFICATION— RESIDENCE—MARKING BALLOTS.

Held:   1. The statute providing for the security and custody of ballots make such ballots primary evidence in an election contest, and when such contest is filed the ballots become evidence for all proper purposes, though they were not produced and proved within the time provided by statute for the taking of proof in the case.

Edwards v. Logan.

2. Where, in an election contest, the circuit judge appointed two commissioners to recount the ballots, it was error for the commissioners to refuse to permit the parties interested and their representatives to be present during their sessions.

3. Where the ballot boxes containing the ballots voted at an election were in the possession of the county clerk, whose re-election was also in contest, and the ballot boxes, though locked, could have been entered by taking off the hinges, which were exposed, the ballots should not be used to rebut the presumption of the correctness of the official returns until it had been satisfactorily proved that the ballots had not been tampered with since the election, and that those offered in evidence were the identical ones cast.

4. Where, in an election contest, the ballots had been counted by commissioners appointed by the court, it was error for the court to refuse to allow the defendant to file an amended answer charging that the ballots had been altered and changed, and that unauthorized and interested persons had access to and opportunities for changing them, and that, therefore, they were not the same ballots counted and certified by the election officers, such objection not being a ground of counter contest required to be set up in the answer, but merely a matter affecting the evidence offered on the grounds already alleged.

5. Acts Gen. Assem. 1900, Ex. Sess., p. 18, section 10, requires that disputed ballots shall be placed in a linen envelope, sealed up, and across the seal the officers shall write their names, and shall place the county election seal in hot wax thereon, and return the same to the clerk of the county court with the election returns, with a true statement as to whether they have or have not been counted, and, if counted, what part, and for whom. HELD that, where disputed ballots were inclosed, but no statement was made as required by the closing clause of such section except the words written on the back of each ballot, "Not counted.   Questioned.   W. H. Hack," such ballots were not properly preserved, and could not be counted in a contest.

6. An idiot is not a competent witness and not a legal voter, but where one was permitted to vote, his vote should not have been deducted from either candidate, because there was no sufficient evidence to ascertain for whom he voted.

7. Where a person of unsound mind was permitted to vote, and the day succeeding the election he was found by a jury to be of unsound mind, and directed to be confined in an asylum, evidence as to his previous party affiliation was insufficient to show how he voted at such election, so as to justify the deduction of his vote from a candidate of that party.

Edwards v. Logan.

8. Under Kentucky Statutes, section 1478, providing that a voter's residence is where his habitation is, and to which, when absent, he has an intention of returning, and that he shall not lose his residence by absence for temporary purposes, an unmarried man, a resident of E. county, did not lose his residence therein by going to Indiana to work, with an intention of returning, where he in fact returned to E. county within a few months, and was living there when the election occurred.

9. Where a resident of Kentucky removed to Indiana with his family, and expressed his intention to remain there permanently, he thereby lost his voting residence in Kentucky, though he afterwards changed his intention, and returned to Kentucky within a year prior to the election.

10. A school census is not admissible in an election contest to show that persons voting at the election were minors at the time of the election.

11. Where a voter testified that he sold his property, and removed his home from one election precinct to another, on September 12, 1901, he was not entitled to vote in the precinct to which he removed at an election held November 5th, he not having resided therein sixty days.

12. Where a ballot was marked with a pencil within the circle under the device under which defendant was a candidate for county attorney and cross-marks were made with a stencil in the squares after several of the candidates, but none after the name of any candidate for county attorney on the opposite ticket, the pencil mark was sufficient to require the ballot to be counted for all candidates, including county attorney, under the emblem, except as to those candidates where the stencil mark was made opposite the names of candidates of other tickets.

13. Where a ballot was marked under both the party devices and also opposite contestant's name, such marking indicated an intention not to vote either party ticket, but to vote for a contestant alone.

W. B. GAINES, JOHN E. DuBOSE AND EDWARD W. HINES, FOR APPELLANT.

We claim that the court erred:

1. In counting two ballots returned from Durbin precinct in an envelope each of which was marked "not counted, questioned, W. H. Hack." No other statement was made. The fact that the election officers wrote their names across the seal of the envelope containing these two ballots is not a compliance with the law and does not amount to a certificate, and is not a "true statement" in the meaning of the statute and is not evidence that the person depositing them were not allowed to vote.

Edwards v. Logan.

2. Cook and Skaggs having been permitted to vote the burden was on contestant to prove they were under age, and the statement of the county clerk that the school records in his office show both were born in 1881 was incompetent evidence as these are not such records as are admissible to prove one's age.

3. While we concede that if the ballots used in the election are properly preserved and introduced in evidence, they outweigh the returns made by the officers of the election, we contend that before they can be considered, they must be filed and introduced in evidence and made part of the record which was not done in this case.

4. The report of the commissioners appointed by the court to count the ballots, does not show where they found or counted them, or in whose possession they were or what they did with them when they finished their labors, and they did not file them in the clerk's office or make them a part of the record.

5. The lower court having considered these ballots in evidence, although not shown to have been properly preserved or filed, or made part of the record, or their integrity established, the contestee alleged and proved that they had been tampered with, but his amended answer alleging this and his affidavits proving it were rejected by the court who refused to permit either to be filed.

### AUTHORITIES CITED.

Banks v. Sargent, 104 Ky., 849; Tunks v. Vincent, 106 Ky., 829; Fenton v. Scott and Hartman v. Young, 17 Oregon, Am. St. Rep., vol. 2, pp. 737 and 801; Tebee v. Scott, Cal. Book, 29, p. 673, L. R. A.; Powell v. Holeman, 50 Ark., 85; McCrary on Elections, p. 293; 10 Am. & Eng. Enc. of Law, 2d Ed., p. 829.

WILLIAM CROMWELL and M. HAZELIP, for appellee.

WILKINS & LAY and D. W. WRIGHT, of Counsel.

1. The law does not require impossibilities and therefore plaintiff could not file the ballots with his petition.     He did all he could which was to refer to and make them part of his petition.

2. The court by an order appointed two commissioners and directed that they take charge of the ballot boxes there in the possession of the county court clerk and open them and examine, canvass, compare and count all the ballots found therein and report the condition of the boxes and ballots including those questioned or rejected, etc.

Edwards v. Logan.

3. This practice has been approved by this court in Bailey v. Hurst, 24 Ky. Law Rep., 506.

. 4. It is conceded that the ballots themselves are more reliable than a mere summary made from them.

5. There were no objections or exceptions filed to the reading of the school census reports proving the nonage of two of the voters and it is too late to execept thereto in this court.

### AUTHORITIES.

Acts 1900 approved October 16, 1900. Bailey v. Hurst, 24 Ky. Law Rep., 506; 10 Am. & Eng. Ency., 831 and notes; People v. Holden, 28 Cal., 133; Civil Code of Practice, sec. 757; Kentucky Statutes, sec. 1471; Laws of Illinois of 1891; Parker v. Orr, 30 L. R. A., 227; Caldwell v. McElvain, 56 N. W. Reporter, 1014; Pettit v. Yewell, 24 Ky. Law Rep., 566; Funks v. Vincent, 21 Ky. Law Rep., 476; Corn v. Sims, 3 Met., 397; Chiles v. Boone, 3 B. M., 88; Kentucky Statutes, subsec. 4, sec. 1478; Spencer v. Society of Shakers, &c., 23 Ky. Law Rep., 856; McCrary on Elections, sec. 474; Hardin v. Cress, &c., 24 R., 512; Am. & Eng. Ency. of Law, 424, 425.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

This contest involves the election to the office of county attorney of Edmonson county. The election was held in November, 1901. On the face of the returns as certified to by the officers of election, appellant had a majority of 19 votes. Within the time allowed by statute, appellee filed a petition in the Edmonson circuit court, in which the validity of the certificate awarded by the election commissioners to appellant was attacked upon two general grounds. One was that the officers of election of each of the precincts in the county had fraudulently or mistakenly counted votes for appellant which in fact had been cast for appellee. The other was that illegal voters had been allowed to vote in certain precincts, and had voted for appellant, and that, when the errors or frauds first mentioned were corrected, and the returns were purged of the illegal votes last mentioned, the result would have been that appellee would have

Edwards v. Logan.

received a majority, and therefore did receive a majority of the legal votes cast at that election for the office of county attorney. Appellant, within the time prescribed also by the statute, filed an answer containing counter charges of a somewhat similar nature. The charges were not as specific, probably, in either instance, as they should have been, but the parties seem to have joined an issue, and to have developed the case by proof upon the averments as made. After the time allotted by statute for the introduction of proof by the respective parties had expired, and at a succeeding term of the circuit court, the judge of the court, upon his own motion, appointed two commissioners—one selected, it is said, from each of the political parties represented by the claimants to the office in dispute—whom he directed to begin upon a day certain, named in the order, to then count the ballots, which were preserved in the county court clerk's office, and which had not been filed in the circuit court up to that time, so far as the record discloses. Exceptions were saved to each party by the order of the court. The commissioners so appointed, having procured the keys to the ballot boxes from the circuit judge, met upon a day subsequent to that first fixed in the order, and proceeded to count the ballots. They declined to permit either of the parties to be present at the count, and refused admission to all others. They reported to the court the result of their labors, in which they stated that they found that the ballots in the ballot boxes showed that appellee had received 950 votes, and appellant had received 948. This did not take into account any of the ballots returned by the election officers as questioned. The officers of election had certified by certificates regularly and duly entered on the night of the election at the close of the polls that appellee had received 935 votes and appellant 954 votes for the office

in question. How the discrepancy occurred is not explained. Exception to the report of the commissioners was sustained upon a ground not now material. Thereupon the court, a special judge presiding, the regular judge having declined to sit in the case, ordered the ballots brought into court, and then proceeded, in the presence of counsel and the parties, to count the ballots. The result of that count was that each of the litigants was found to have received 949 of the unquestioned ballots.

The first question presented by this appeal is whether, in the first place, the ballots were properly before the court as evidence, and, in the second place, whether the court's action concerning the custody, inspection and counting of the ballots was authorized by law. For appellant it is insisted that the ballots, not having been produced and proved within the time provided by the statute for the taking of proof in the case, could not be subsequently introduced, because to so allow would be to permit the introduction of evidence for the party so using them after the time allotted by the statute for that purpose. The court is of opinion that it was the purpose of the Legislature, in enacting the law providing for the preservation of ballots, and providing that they should be locked in boxes with separate locks, so that the keys to one should be in the hands of the officers of the precinct of one of the political parties, and the keys to the other lock in the hands of the officers of the other political party, and that, in the event of a contest, the keys were to be delivered by such officers to the judge of the circuit court of the circuit having jurisdiction of the case, to make such ballots evidence of the first importance in a contested election. When such a contest is filed, the ballots become evidence by that fact for all proper purposes before the trial court, to be introduced and consid-

Edwards v. Logan.

ered upon such issues as may be legally joined under the provisions of the act. We therefore decide that it was proper to consider the ballots on the determination of the questions in issue in this case in so far as they shed light thereon, and subject to the rule announced below.

Whether the court should have appointed commissioners to aid it in tabulating and counting the ballots is a matter not entirely free from doubt. It may well be argued that the duty of canvassing returns of an election can only be exercised by those officials specifically charged with it, who are, in the first place the officers of election of the several precincts; then the commissioners of election of the county; and then, in the case of contest, the circuit court upon whom jurisdiction is conferred by the statute. The expression in that act that "the action shall proceed as an equity action" would seem to have reference more especially to the manner of the production of evidence, which is by deposition exclusively under the Civil Code, in equitable cases, and dispensing with the jury; for in no other particular do the actions appear to be tried as equitable actions. In fact, in many particulars, noticeable in the terms of the statute, they are quite dissimilar from equitable actions. From the expression above referred to it has been thought that the court found its power to appoint commissioners. But whether this is true or not, it was not proper for the commissioners to have excluded the parties and their counsel from the proceedings when they were opening and canvassing the returns in litigation, nor was it regular or proper for them to have held a secret meeting for that purpose, however pure may have been their intentions. Certainly, the parties to the litigation, in person or by counsel or both, were entitled to witness, not merely the opening of the ballot boxes and the envelopes containing the ballots, but also

to inspect their condition, and verify the actions of the commissioners. Such an arbitrary right should not be, and we hold is not, vested anywhere, with respect to the returns of an election. The rule may be stated to be that, where the ballots are preserved so that their identity is assured, they can be counted during a contest; and they are undoubtedly better evidence of the vote cast than the returns, and should prevail where there is a difference. Hughes v Holman, 23 Or., 481, 32 Pac., 298; Owens v. State, 64 Tex., 500; People v. Holden, 28 Cal., 123. But before a recount of the ballots should be allowed to rebut the presumption of the correctness of the official returns, it should be proved satisfactorily that the ballots had not been tampered with since the election, and that those offered in evidence are the identical ones cast. On this point it was said in the case of People v. Holden, 28 Cal., 133: "We must presume that the officers of election honestly performed their duty in the premises; that they did not mutilate any of the ballots, but, on the contrary, strung them, in the condition in which they were found in the ballot box, on a thread, and sent them in that condition to the clerk's office. The same presumption exists in relation to their custody by the clerk. . . . The Legislature could have had no other design in thus providing for the preservation of the ballots than to make them evidence of their own contents, and a test of the correctness of the returns made up from them by the officers of the election. They are in fact made a part of the returns, for it is expressly provided that they shall be sealed up with the poll list and tally paper, with the certificates of the officers attached, and indorsed 'Election Returns.'" That presumption of integrity of the ballots can not attach, however, until it is first shown that they came from the officer whose duty it is by law to have and

Edwards v. Logan.

preserve them, and that they are apparently in the condition of preservation prescribed by the statute. When that much is shown, the legal presumption as to their integrity attaches. On the contrary, however, if it be shown either that they have been tampered with, or that access has been afforded to them to persons unauthorized by law, then the burden shifts, and it thereupon becomes the duty of the person offering and relying upon such ballots to prove affirmatively not only that they are the identical ballots cast in the election, but they have not been mutilated, changed nor tampered with. In People v. Livingston, 79 N. Y., 288, it was said: "The statute requires the ballot boxes to be preserved undisturbed and inviolate, and it is incumbent upon the party offering the evidence to show that they had been so kept; not beyond a mere possibility of interference, but that they were intact to the satisfaction of the jury. The burden was upon the relator to satisfy the jury that the boxes had remained inviolate. The returns are the primary evidence of the result of an election. They are made immediately upon canvassing the votes, and the votes are canvassed at the close of the polls, in public, and presumably in the presence of the friends of both parties. . .

After the election it is known just how many votes are required to change the result. The ballots themselves can not be identified. They have no earmark. Everything depends upon keeping the ballot boxes secure, and the difficulty of doing this for several months, in the face of temptation and opportunity, requires that the utmost scrutiny and care should be exercised in receiving the evidence. Every consideration of public policy, as well as the ordinary rules of evidence, require that the party offering this evidence should establish the fact that the ballots are gen-

uine. It is not sufficient that the mere probability of security is proved, but .the fact must be shown with a reasonable degree of certainty. If the boxes have been rigorously preserved, .the ballots are the best and highest evidence, but, if not, they are not only the weakest, but the most dangerous, evidence." Judge Cooley, in his work on Constitutional Limitation (625), announces substantially the same rule. Also, see People v. Sackett, 14 Mich., 320; People v. Cicott, 10 Mich., 283, (97 Am. Dec., 141). The authorities are abundant that, where ballots have been so exposed as to have offered opportunity to be tampered with, and have not been guarded with that zealous care which will contravene all suspicion of substitution or change, they lose their presumptive purity, and are no longer to be relied on as evidence in a contest or judicial inquiry as to the result of an election. McCrary, Elect., 475, etc.; Powell v. Holman, 50 Ark., 94, 6 S. W., 505; Hudson v. Solomon, 19 Kan., 177 (opinion by Brewer, J.) ; Hartman v. Young, 17 Or., 150 (20 Pac. 17, 2 L. R. A., 596, 11 Am. St. Rep., 787).

Another fact in this case is that at the same general election in Edmonson county out of which this contest grows the office of the clerk of the county court was also in contest; that is, the incumbent, who had received the certificate, and who continued in office, having the custody of the ballots in question, was interested in the result and condition of these ballots, because his office was also then being contested. The ballot boxes, though locked, it is suggested, were wooden boxes, so constructed that they could have been entered by the use of a screwdriver, taking off the hinges, which were exposed. In Albert v. Twohig, 35 Neb., 563, (53 N. W., 582), it was said that, although "the ballots cast constitute the primary evidence to determine the rights of

the respective parties, it must appear, however, that they have been preserved substantially in the manner and by the officers prescribed by the statute.  If they have been placed in a position to be tampered with by interested parties, the burden of proof is on the party offering them in evidence to show that they are in the same condition as when sealed by the several election boards.  And, in the absence of such proof, it was held that the ballots were properly rejected as evidence."  In this case, after it had become apparent that the court was going to count the ballots, which had been in the hands of the commissioners, appellant offered to file an amended answer, in which he charged that the ballots had been altered or changed, that unauthorized persons and interested persons had access to them, and opportunities for changing them, and that, therefore, they were not the same ballots that had been counted and certified by the officers of election.  This amendment was rejected by the court, doubtless upon the theory that the statute governing the pleadings in this particular class of cases requires that the grounds of contest shall be stated in the petition, and those of counter contest shall be stated in the answer, and that none other shall be considered by the court.  In its strict sense this is not a ground either of contest or of counter contest, but is a matter affecting the evidence offered on the grounds already set out.  The court is of opinion that the pleading should have been allowed, and the facts stated therein should have been permitted to be proved, even without the pleading.

From these authorities this court holds:  That the ballots cast in an election are the primary and best evidence of the voters' will as expressed therein, and that in case of a contest, as between the certificates of the officers of election and the ballots, the ballots are the best evidence, but

that this is conditioned strictly upon the fact that the integrity of the ballots is clearly established; otherwise the certificate of the officers of election should prevail. Railey v. Hurst, 24 R., 504 (68 S. W., 867). That when the ballots are produced from the custody of the officer, whose duty it is to preserve them, are shown to have been preserved from intermeddling from unauthorized persons, and are apparently unchanged, they will be received as evidence of what they may show upon their face; but where they may have apparently been tampered with, or where opportunities have been afforded to unauthorized persons, or to persons interested to tamper with them, then the burden is upon the party producing and relying upon such ballots to establish their integrity clearly and satisfactorily by the evidence. In this case the court erred in receiving the ballots as conclusive under the circumstances recited, and as better evidence that the certificates of the officers of election. However, in view of the conclusion to which we have arrived upon other points, the case will not be remanded for a new trial because of this fact, for the reason that to do so would be only to afford an opportunity to the successful party to increase his majority already established.

There was a number of so-called "questioned" ballots returned by the officers of the election, there being some from every precinct in the county, excepting perhaps one. The certificates required by the statute to be attached to these questioned ballots was not attached in any instance. The statute on this point reads as follows (Act to Further Regulate Elections, Acts Gen. Assem. 1900, Ex. Sess., p. 18, section 10): "That if there are any ballots cast and counted or left uncounted, concerning the legality or regularity of which there is any doubt or difference of opinion in the minds of the judges of the election, said ballots shall be

placed in the large linen envelope furnished by the county clerk for that purpose, and sealed up, and across the seal thereof the officers of the election shall plainly write their names, and at the point of the seal indicated for that purpose the judges of the election shall, in the presence of the clerk and sheriff, place the county election seal in hot wax, as above described, so that it can be plainly read, and the same shall be returned to the clerk of the county court with the returns of the election, for such judicial or other investigation as may be necessary, with a true statement as to whether they have or have not been counted, and if counted, what part and for whom." The learned trial judge rejected all of these contested ballots except two, because the statement required by the closing clause of the section of the statute above quoted was not made. As to the two excepted, and which he counted for appellee, the only statement as to how they were voted was this, written on the back of each ballot: "Not counted. Questioned. W. H. Hack." Hack was the clerk of the election at that precinct. These ballots were inclosed in an envelope, and the envelope was indorsed as required by the statute—that is, the officers signed their names across the seal on the envelope, which had been sealed with wax, and stamped; but there was no other statement as to how these ballots were voted, save the one of the clerk above quoted. Now, was the statute complied with as to the certificate required by the statute showing how they were counted, or whether at all counted, by the officers of the election. In Struss v. Johnson, 100 Ky., 319 (18 R., 771) 38 S. W., 680, this identical question of certificate was under consideration. The court held that this provision of the statute was mandatory, and that, "to render doubtful or questioned ballots admissible as evidence in a judicial or other investigation, we are

of opinion that they must be sealed, and returned with the statement of the officers of election, as required by the statute." This was followed in Banks v. Sergent, 104 Ky., 849 (20 R., 1024) 48 S. W., 149, and Anderson v. Likens, 104 Ky., 699 (20 R., 1001 (47 S. W., 867). We are of opinion, therefore, that the court erred in counting the two ballots in question.

Among the illegal votes cast at this election was one cast by Lewis Hill, who is conclusively shown to have been an idiot. Copies of inquests finding him such were produced in evidence. Under the Constitution and statutes of this State idiots and lunatics are not permitted to vote, and this person should have been excluded from the polls. The trial court, upon the evidence, which we will notice, deducted his vote from appellant. That evidence was that this person claimed to belong to the same political party of which appellant was the nominee, and that afterwards the idiot had stated that he had voted the straight ticket of that party. On the other hand, appellant proved by another witness that, while the idiot had told him that he had voted the straight ticket of the party, yet, when describing how he voted that ticket, he showed that he voted it by placing the stencil mark under the emblem of the opposite party. Manifestly, the statements of this idiot should not have been received, or, if received at all, the result is that each cancels the other. What a voter may say after the election, and after he has voted, as to how he voted, is at best but hearsay. An idiot, of course, is one who is destitute of mind, and has been since his birth. Such a person would not be competent as a witness. Certainly, his statement out of court could have no more legal force than his statement made in court under oath. We are of opinion that the court erred in deducting this vote from appellant.

George Parsley is shown to have voted at this election. It was claimed that at the time he was a lunatic. Two questions in his case are therefore presented: First, was he disqualified? and, second, how did he vote? The evidence is conflicting as to the state of his mind on the day of the election. One witness gave it as his opinion that he had not mind sufficient to know the nature of a vote or to transact business. Another, on the other side, gave it as his opinion that he was competent and qualified. Another gave his opinion that he was disqualified, and he judged that fact from what the voter said, and detailed what the voter said. The matter detailed does not of itself show him mentally deranged. The evidence is substantially the same, as to the mental capacity of this witness, as was shown in regard to that of his father and brother, all of whom had at times been afflicted with this unfortunate malady; and all of whom had at times been confined in asylums for the insane. All of them, however, had, previous to this election, been discharged. On the day following the election, this voter was, by a verdict of a jury in a trial then had and that day begun, found to be of unsound mind, and was directed to be confined in an asylum. When his malady reappeared so as to justify this action does not appear, independent of the testimony above referred to. The question whether he is a competent voter is not entirely free from doubt. The political affiliation of this voter, so far as he had always claimed to have one, was proved. Other than this there is no evidence in the record as to how he voted. This court held in Tunks v. Vincent, 106 Ky., 829 (21 R., 475) 51 S. W., 622, that the declarations of a voter, made after the election, as to how he voted, were incompetent as hearsay. In that case, however, it was held that, if the voter was placed upon the witness stand as a witness, and

was willing to state how he voted, but the opposite party interposed an objection, and told him that he need not answer unless he wanted to, and that thereupon the witness refused to answer, these facts, coupled with the further proof of his party affiliation, that he had been an active and strenuous partisan, were sufficient circumstances to justify the finding that the witness had voted for that party with whom he had affiliated, and whom he had accommodated by refusing to answer a question which he had previously expressed a willingness to answer. In this case, however, a number of these elements are lacking. The only fact that would indicate how this voter voted is the one of his previous party affiliation. Now, if he was insane, and so insane as to be classed as a lunatic—that is, did not have mind sufficient to know or to comprehend his act, or will power to control it,—it is as probable that he voted against as for his party affiliation; at least there is no reasonable probability that could be ascribed to his secret conduct when in such deranged condition because of his judgment and opinions entertained when in a rational and sane state of mind. We know as a matter of fact that lunatics frequently, if not generally, do exactly the contrary, while insane, to what they would have done when of sound mind. It is the opinion of the court that the trial court improperly deducted this ballot from appellant.

Virgil S. Wolf voted for appellant. His vote was deducted by the trial court because it found that he was an illegal voter. The facts appear to be that he was an unmarried man, and had previously lived in Edmonson county, in the precinct in which he voted, but had some time during that year gone to Evansville, Ind., to work. He remained there a few months, returned to Edmonson county, and was living there when this election occurred. The

voter testified that when he left Kentucky he left with the intention of returning; that he then claimed, and has always since claimed, Edmonson county as his home; and that while in Indiana he did not vote there, and did not claim his residence there; that his absence was but temporary. His brother testified that the voter had previously made his home with him, and had returned to his place, and was making his home there before and at the time of the election, and that before he left for Indiana he expressed an intention to retain his residence in Edmonson county. Section 1478 of Kentucky Statutes regulates this question of residence. The first subsection is: "That shall be deemed his [the voter's] residence where his habitation is, and to which when absent he has the intention of returning. He shall not lose his residence by absence for temporary purposes merely." The court is of the opinion that this witness was a legal voter at this precinct.

Stanley S. Minton is shown to have voted for appellant. Previous to the election he had removed to Indiana with his family, and expressed his intention to remain there permanently. Afterwards he evidently changed his intention, and returned to Edmonson county, but within a year before the election. His vote was deducted from that given to appellant, and, we think, rightfully.

James Cook and Andrew W. Skaggs voted, evidently, for appellant. Their votes were deducted upon the theory that they were minors at the time of the election. The only evidence before the court that they were minors was the testimony of the county court clerk that a school census on file in his office showed that each of these voters was born within twenty-one years before the date of the election. The court is of the opinion that this school census is not evidence of the date of the birth of these people for any other

purpose than school purposes. Who gave it to the school assessor or trustee, and who reported it, was not shown; nor, indeed, was the report of the census itself offered in evidence. It was merely the clerk's statement of what he had found the state of the record to disclose. The court is of opinion that these two votes were improperly rejected.

Marcellus Bailey is shown to have voted for appellee. Within sixty days before the election he removed from the precinct in which he had been living for some months into another precinct, in which he had not lived, and voted in the latter precinct. He is the only witness on the subject. He testifies that he did not move until the 12th of September, 1901 (the election occurred on the 5th of November); that on the 12th of September, he sold his property, and removed his home. This vote was not excluded from appellee, but should have been.

Rufus Tartar is shown to have voted for appellee, and the court deducted the vote upon the ground that he was an illegal voter. No complaint is made that this action was not proper. The record is pretty clear that he was an illegal voter. The facts in the case of this voter are substantially the same as Stanley S. Minton's, above discussed.

There was one ballot rejected that had been marked thus: The cross-mark was made with a pencil within the circle under the device under which appellant was a candidate. Then cross-marks were made with the stencil in the squares after several of the candidates, but none after the name of any candidate for county attorney on the opposite ticket. The court has held in the cases of Houston v. Steele, 98 Ky., 596 (17 R., 1149) 34 S. W., 6, and Graham v. Graham, 22 R., 123 (68 S. W., 1093), that a mark with a pencil at the point where the stencil should have been made is equivalent to a mark with the stencil. It would, therefore,

appear that this mark was sufficient in law to have voted the ballot for all of the candidates, including county attorney, under the ticket under the emblem of which the pencil mark was made, except as to those candidates where the stencil mark had been made opposite the names of the candidates of the other ticket. One ballot was counted for appellee which had been marked under both of the party devices or emblems, and also opposite the name of appellee. By marking his ballot so he indicated an intention, as shown, in our opinion, to not vote either party ticket, but to vote for the person alone opposite whose name he had marked. The ballot was properly counted.

There are other questions presented in the record, but which do not appear to affect the result, and which are not argued in briefs. We refrain, therefore, from discussing them. The result is that appellant received a majority of the legal votes cast for the office of county attorney, and the judgment should be rendered accordingly.

The judgment is reversed, and the cause remanded for proceedings consistent herewith.

(June 20, 1903.)

Response by Judge O'Rear to petition for rehearing:

The very earnest petition for a rehearing has induced a careful re-examination of the record, and that by other judges than the one who wrote the opinion. As the result, the court concludes to adhere to the former opinion. However, there are two matters, unimportant as affecting the result, or any conclusion of law announced, that we desire to correct. We do not, and did not, intend, by anything said in the opinion respecting the action of the two com missioners who canvassed the returns, to intimate that they were actuated by other than perfectly honest motives, or

that their count of the ballots was not absolutely fair. The order appointing the commissioners recites that "this order is made without prejudice to the rights of either party." This the court construed into being a formal exception, though it appears the order was indorsed "O. K." by one of the parties and by the attorney of the other. It is said this operated as a consent to the order, and perhaps it did.

Lewis Hill and George Parsley were held by the lower court to be illegal voters. But their votes were not deducted, because there was not sufficient evidence in the opinion of the trial judge as to how they voted to authorize it. Hill, we held to be an illegal voter, but as to Parsley we did not decide whether or not he was a legal voter. We concluded, also, that there was not sufficient evidence as to how they voted to warrant the deduction of their votes from those of either candidate. It is due to the trial judge to say that the result of his finding respecting these two votes is sustained; but, as neither he nor this court rejected those votes, the result is not affected.

The petition for rehearing is overruled.

Judge Settle not sitting.