N. R. Barham *v.* W. H. Denison.

(*Nashville.* December Term, 1928.)

Opinion filed May 27, 1929.

C. W. Hewgley and R. R. Sneed, for complainant, appellant.

J. C. R. McCall and W. H. Lancaster, for defendant, appellee.

Mr. Justice Cook delivered the opinion of the Court.

Upon the face of the returns, the defendant W. H. Denison was elected Judge of the Twelfth Judicial Circuit by a majority of thirty-eight votes. Judge N. R. Barham, by petition duly filed with the chancellor, con-

tested the election. The chancellor sustained the defend-ant's demurrer and dismissed the petition.

On appeal the questions raised by the demurrer were disposed of in memorandum opinion filed, affirming the decree of the chancellor in part, but as therein stated the cause was remanded for answer and proof upon charges of illegality and fraud affecting the result in Henderson County, the petition being held sufficient to require answer and proof upon the following charges:

First. That three or four ballots were carried from the polling place at Darden and an indefinite number at Blackwell, which were marked and returned by a mes-senger, who was permitted to deposit them in the ballot box in the name of the persons purporting to vote.

Second. That fifteen or twenty voters were illegally aided in marking their ballots at Alberton precinct.

Third. That fifty to one hundred and fifty voters were bribed at two precincts in Lexington.

Fourth. That seven hundred and thirty in the seven districts of Henderson County, subject to payment of poll tax, illegally voted without a tax receipt obtained upon payment of the tax more than sixty days before the election.

Referring to the four subjects of inquiry, it was said in the opinion in substance, and specifically in the re-sponse to the petition to rehear: "The bill sets forth facts and makes charges of illegal votes cast and counted at particular precincts, and it was alleged that with the returns purged of these illegal votes the petitioner was elected. These charges we deemed sufficient to require answer and proof with a view of purging the returns of the alleged illegal votes."

The fact that the charges, some not sufficiently specific, involved a judicial office and might reflect upon

the integrity of the incumbent, justified the remand for answer and proof, although the petition afforded no definite objective as to some of the four subjects of inquiry. We were not unmindful that an election contest is a judicial proceeding controlled by the usual rules of practice and procedure and that the petition should present more than mere charges of fraud and irregularity in the election as the basis for a judicial investigation beyond the election returns. Specifications are necessary in such cases to avoid indefinite and indeterminable inquiry. *Blackburn* v. *Vick,* 2 Heisk., 517; *Crockett* v. *Mc-Lanahan,* 109 Tenn., 517; *Nelson* v. *Sneed,* 112 Tenn., 33; *Maloney* v. *Collier,* 112 Tenn., 78; *Red River Furnace Co.* v. *Tennessee Central R. R. Co.,* 113 Tenn., 607; *Potter* v. *Robbins,* 155 Tenn., 6.

The cause is before us to review the action of the chancellor under the petition and answer upon the proof adduced. Questions of practice and procedure in perfecting the appeal raised by counsel for the defendant are passed until the propositions presented by complainant's assignments of error have been disposed of.

It is insisted by the complainant that the chancellor erred in refusing to declare the election in Henderson County void in its entirety, and at least in not declaring the election void at Lexington, Darden, Blackwell and Alberton precincts because the returns were so tainted with fraud and illegality as to destroy their value as *prima-facie* evidence of the result. The legality of a majority of the votes cast in Henderson County and in the particular precincts was not questioned by the petition and was not shown by the proof. To annul the election in Henderson County, or at the challenged precincts, would affect such a proportion of the unchallenged and

legal ballots cast as to render the election void throughout the circuit. *Berry* v. *Lauk,* 5 Cold., 58.

It was determined on the former appeal that the specifications in the petition were not sufficient to authorize the annulment of the election, and that from the allegations of the petition an inquiry would discover the illegal votes alleged to have been cast and counted for the defendant, and the inquiry on the remand was so limited. Assignments of error to the action of the chancellor in refusing to declare the election void in Henderson County, or in the precincts referred to, are without merit.

The duty to arrange election booths and afford secrecy in marking ballots is imposed by law upon the election officers. They may be compelled, in appropriate proceedings, to observe that duty but misconduct or irregularity on their part in providing facilities for the voters will not justify the rejection of returns at precincts where misconduct and irregularity of the election officers occurred, in the absence of a showing that such irregularity prevented a fair expression of the will of those whose ballots were received and counted. *Browning* v. *Gray,* 137 Tenn., 70.

The chancellor committed no error in refusing to exclude the returns at Blackwell and Alberton precincts because of the failure of the election officers to comply with the election laws in providing adequate booths for the voters. The officers of the election testify that the election was held according to previous custom, that they were provided no means for use in constructing formal booths, and the proof does not indicate that they were called upon before or at the election to do so; and the proof does not indicate that the voters or any of them were deprived of the free and fair expression of their

will at the ballot box as arranged for them by the authorities.

The petition indicated that illegal votes alleged to have been cast and counted for the defendant could be ascertained by proof and the cause was remanded to enable their discovery and exclusion from the returns, and the burden was upon complainant to show the illegal votes; and that rule applies, whether the alleged illegality was produced by bribery or otherwise. The petitioner is making a collateral attack upon the result certified by the election officers. Their returns are conclusive of the result until overcome by evidence. *Red River Furnace Co.* v. *Tennessee Central R. R. Co.,* 113 Tenn., 607; *Morrison* v. *Buttram,* 154 Tenn., 683; 20 C. J., p. 238, secs. 322-324.

■ "Fraud or bribery in an election must be established by direct proof or by circumstances from which the inference of fraud or bribery naturally follows, and facts creating only suspicion or mere conjecture are not sufficient. So evidence which merely tends strongly to suspicion that certain votes were illegally cast is not sufficient to throw out the ballots, and clear evidence must be furnished as to how an illegal voter cast his ballot before his vote can be deducted." 20 C. J., p. 248, sec. 342; *Scholl* v. *Bell,* 125 Ky., 750; *Edwards* v. *Logan,* 114 Ky., 312.

According to these authorities, which do no more than observe ordinary rules of logic and reasoning, where illegal votes are proven it must be shown by direct or circumstantial evidence that such votes were in fact cast and counted for the contestee before they can be stricken from the results certified by the election officers (*Scholl* v. *Bell, supra; Edwards* v. *Logan, supra*), for the voter in marking his ballot may not have voted for either

candidate for circuit judge or may have voted for the contestant.

■ Upon issues raised by the petition and answer upon the four subjects of inquiry for which the cause was remanded, one hundred and sixty or more witnesses were examined orally before the chancellor. N. R. Oakley and Will Asbill testified that they assembled negro voters in a vacant picture show house at Lexington on the afternoon of the election, instructed them how to vote and paid them money for voting. There is no evidence to show how all of these voted. There were only eighty-nine negro men voters in the two precincts at Lexington. Oakley and Asbill indicated forty of them as coming to the show house and receiving money. Thirty-four of those indicated were introduced and testified that they voted for the candidate of their choice for circuit judge without interference from anyone.

A salient fact developed by the testimony of Oakley and Asbill is that they were working in the interest of Democratic candidates for county office and were interested in local candidates primarily. Oakley, a Democrat, says he was for Denison, a Republican, and Asbill, a Democrat, says he was for Judge Barham. The funds that were used to corrupt the negro voters were contributed by Democratic candidates for county offices and their friends, and were being used on behalf of the county candidates.

According to the preponderance of the evidence neither candidate for circuit judge was cognizant of the conduct of Oakley and Asbill. Early in the afternoon, after assembling at the show house, as Oakley and Asbill admit, they called a truce in the circuit judge's race and agreed to direct their efforts to their primary object of obtaining votes for their favorites among the county candidates.

Oakley and Asbill received no money from either candidate for circuit judge or their friends, as appears from a preponderance of the evidence. Oakley admits that he stated, in Asbill's presence, after the election and before the trial in the presence of several gentlemen, that they had no money for the use of either candidate for circuit judge and that they agreed to leave it off and make their fight for the county Democratic ticket; and in this conversation there is evidence that when Oakley made the statement Asbill replied that Judge Barham received a majority of the votes from the negroes who went to the show house the afternoon of the election and that Oakley concurred in the statement.

Of the forty voters referred to by Oakley and Asbill as having accepted money from them under the circumstances referred to, nineteen testified that they voted for complainant Barham and eleven testified that they voted for defendant Denison. Others of them summoned by complainant and available as witnesses did not testify. The total vote cast at the two Lexington precincts was 628. Complainant received 180 votes and defendant 361 votes, 87 not voting for either candidate for circuit judge. There is no evidence to show how the others indicated by Oakley as having accepted bribes voted, or that they even marked their ballots for either candidate for circuit judge. The circumstances are not sufficient to cast upon defendant the burden of showing that he was not the beneficiary of the other votes alleged to have been corrupted by Oakley and Asbill, for it is not shown that they voted at all, and there is a margin of 87 votes that were not cast for either candidate. While Oakley broadly states that there were from 50 to 150 negroes assembled at the picture show house, the undisputed evidence shows that there were only 89 negro men voters at both the Lexing-

ton precincts and the record also shows that many of these voted in the morning before Oakley assembled his crowd at the picture show house.

The doctrine of apportionment cannot be applied to the Lexington precincts or to the other precincts in the county, because it appears from the record that direct evidence was available to show how all the alleged illegal votes were cast. Apportionment is permissible only where it is shown to be impossible to ascertain for whom the illegal votes were actually cast. *Potter* v. *Robbins*, 155 Tenn., 1. The evidence shows that many voters did not mark their ballots for either candidate for circuit judge and it cannot be determined whether these or those voting for the candidates were legal or illegal voters.

■ We find no error in the action of the chancellor disposing of the charge that election officers illegally aided fifteen or twenty voters at the Alberton precinct. He found that all the ballots shown to have been marked with assistance of the election judges were authorized because of physical disability of the voters to whom assistance was given, with the exception of three who were shown to have voted for the defendant and deducted from the returns at that precinct. The ballots marked by Mrs. Mary Myracle, Mrs. Asa Davis and Mrs. Neely at their homes and sent by a messenger who deposited them in the ballot box at Darden, the chancellor held to be void, but found that they could not be deducted because it did not appear for whom the ballots were marked. The circumstance that Mrs. Myracle was the aunt of the defendant Denison authorizes the conclusion that she voted for him, and that ballot should have been deducted along with the other three whose ballots were illegally marked by the election judges.

Referring to those alleged to have voted without payment of poll taxes, it is merely shown that names of certain of them were on tax books and that they were subject to a poll tax. It is not shown that all of them voted. Most of those who did vote, it is developed by the evidence, had either paid their tax more than sixty days before the election or were not legally subject to the tax. It is not shown how they voted, and so apportionment could not be made of this list of voters.

The chancellor properly refused to deduct from defendant's vote and charge him with the responsibility of poll tax receipts issued in block, to men interested in candidates for county office, more than thirty days before he announced as a candidate for circuit judge, and sixty days before the election (1) because it is not shown that the beneficiaries of such receipts voted for the defendant; (2) because in an election contest the court must observe the rules of practice and procedure that confines the evidence to the issues raised by the pleadings.

The disqualification of voters for this cause was not attacked by the petition. Votes induced by the purchase of poll tax receipts and gratuitously distributed to the voters who used them in voting would render their votes illegal, and under proper pleadings and proof such votes would be excluded from the returns upon a showing of how they were cast and counted. The record does not show that any of this class of votes were cast and counted for the defendant.

We have read the evidence in this large record with painstaking care and considered the case as upon trial *de novo,* and find that the evidence supports the chancellor's finding of facts. See *Kingery* v. *Berry,* 94 Ill., 515. It is not necessary to repeat what was said by the

chancellor in his comprehensive review of the evidence and finding of facts.

In contested election cases involving the officers referred to in sections 1308-1309, Shannon's Code, jurisdiction is exercised by the circuit court as a court and on appeal in such cases from the judgment of the court the cause is reviewable *de novo*. *Moore* v. *Sharpe,* 98 Tenn., 493; *Shields* v. *McMahan,* 112 Tenn., 5.

Chapter 32, Acts of 1853-4 (Shannon's Code, secs. 1320-23) which provides a remedy for contesting the election of circuit judge, chancellor and attorney-general does not confer jurisdiction upon the chancery court, as a court, but constitutes the chancellor a special tribunal to determine and hear the contest. *Wade* v. *Murray,* 2 Sneed, 54; *Shields* v. *Davis,* 13 Tenn., 541. In such case the chancellor may prescribe the practice and procedure for the trial. *Berry* v. *Griffith,* 1 Heisk., 556; *Harmon* v. *Tyler,* 112 Tenn., 23. That was done. With the approval of both parties the chancellor adopted the practice and procedure that govern courts of chancery in the trial of causes in that court. The hearing of evidence before the chancellor ended September 1, 1927, and he took the case under advisement. The record is large and the facts were complicated and a fair consideration of the numerous subjects of inquiry requires time to analyze the proof. The chancellor filed his written finding of facts July 5, 1928. A motion for a new trial was filed July 29, 1928, and overruled August 28, 1928, when a final judgment was entered by the chancellor. An appeal was prayed and granted. Thirty days were allowed within which to file an appeal bond and sixty days within which to file a bill of exceptions required to preserve the oral testimony and make it a part of the record.

█ Appeal in election contests before the chancellor is provided for in chapter 111, Acts of 1855-6, which reads:

' "Either party in cases of contested elections under the Act of 1854, chapter 32, may, if they desire, have an appeal to the Supreme Court, and it shall be in all respects governed by the same rules and regulations as other chancery cases."

No means is provided by statute for preserving the record by bill of exceptions in contested election cases which are heard before the chancellor who sits as a special tribunal and not as a court. The jurisdiction of the chancellor was limited to the trial of the particular case, and when the contest was determined and the result was announced, the tribunal constituted by statute to decide the questions involved became *functus officio*. No inherent power lay in the chancellor to exercise any official act after his final determination. He possessed no power beyond the provisions of the statute.

█ This presents for the first time, in this State, the question of whether or not the chancellor, sitting as a special tribunal, can verify a bill of exceptions; to preserve the record made before such tribunal, after exercising and exhausting the extraordinary powers conferred upon him by the statute. However, being impressed that local conditions, disclosed by the petition and the record invited this contest, we reviewed the facts as if the exceptions were duly preserved and made a part of the record. It, therefore, becomes unnecessary to determine the questions raised by the defendant's motion. After a careful review of the evidence, we find that it sustains the findings of fact and conclusion of the chancellor. Since, as we have stated, the circumstances sur-

rounding the parties induced the contest, we direct an equal division of all the costs, except State and county tax which must be adjudged against the losing party.