HOLLIS *et al. v.* STATE *ex rel.* VAUGHAN.

*(Nashville,* December Term, 1950.)

Opinion filed March 9, 1951.

LINDSEY & LINDSEY, and JOHN F. MORRISON, JR., all of Lawrenceburg, for complainants, defendants in error.

RAY HOLLIS and FREEMON & FREEMON, all of Lawrence-burg, for defendants, complainants in error.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

This is a proceeding instituted by Charles W. Vaughan as an election contest with reference to the office of County Judge of Lawrence County. The contestee is Ray Hollis to whom the Lawrence County Election Com-

mission issued a certificate of election following the regular biennial election held on August 3, 1950. Vaughan also made parties to the proceedings the three Lawrence County Election Commissioners, naming them. Hollis and these Commissioners will hereafter be referred to collectively as contestee.

Thirty days after the proceedings were commenced Vaughan moved for leave to amend in the particulars hereinafter stated his "sworn statement of the grounds of the contest" (such statement hereinafter being called a bill). The amendments were allowed over the objection of contestee by the Chancellor. Contestee filed a motion to strike Vaughan's bill as amended. This was overruled, as was their subsequently filed demurrer. An appeal was prayed and allowed from all of the foregoing action of the Chancellor. The case is here on that appeal for decision of the questions thereby made.

Vaughan's bill charges that the Election Commissioners of Lawrence County decided to use the power vested in them by reason of this office for the purpose of "taking over the management of the civil affairs of Lawrence County" and for the accomplishment of this purpose to elect county officials who would be subservient to their will, and declared that if necessary they would "steal the election" in order to elect such persons. The fifty-one page bill of Vaughan specifies quite a number of alleged fraudulent and illegal acts upon the part of the commissioners with reference to the election, all of them said to have been designed and carried out for the purpose of so "stealing the election"; that as a result of such conduct "the election was so permeated with fraud, irregularity and illegality that it was not an expression of the will of the electors", and that "such fraud, irregularities, illegalities and violations of the

law have rendered it impossible to ascertain the will of the voters and electors in such election, and have rendered the result of the election incurably uncertain, to such an extent that such election is an absolute nullity and void''.

It is alleged that Vaughan was the incumbent County Judge and was a candidate for re-election, and that the candidate opposing him who was supported in the manner aforesaid by these commissioners is the contestee, Ray Hollis. It is alleged that Hollis ''was fully aware and cognizant of all of such fraudulent, irregular and illegal acts and violations of law set forth above, acquiescing therein, approving the same and participating therein''.

Vaughan states in his bill that he does not seek to have a decree declaring Vaughan to have been elected, but that the end sought is an adjudication declaring the entire election ''null and void'', it being stated that this relief is sought ''for the general welfare''.

Code, Section 2123 requires that a contest instituted by a candidate in a judicial election shall be commenced within twenty days after the election. Vaughan's bill was presented to the Chancellor within that time. It was then styled '' Charles W. Vaughan v. Ray Hollis'' and the commissioners. Thirty days after the bill was filed Vaughan moved for leave to amend so as to affirmatively declare on the face of the bill that it was being prosecuted by Vaughan in the name of the State on the relation of Vaughan. The contestee excepted to the action of the Chancellor in allowing this amendment over their objection. This is one of the assignments of error here. The insistence is that this amendment stated a new cause of action which is barred by the aforesaid twenty day statute of limitations provided by Code, Section 2123. *Harmon* v. *Tyler,* 112 Tenn. 8, 83 S. W. 1041,

and *State ex rel. Davis* v. *Kivett,* 180 Tenn. 598, 177 S. W. (2d) 551, are relied upon by contestee in support of this insistence.

In *Harmon* v. *Tyler* and *State ex rel.* v. *Kivett,* supra, the proposed amendment presented a new ground of contest, and it was sought more than twenty days after the election. Since Code, Section 2123 requires that the contestant shall "present a sworn statement of the grounds of contest" within twenty days after the election, it would have been a violation of the clear mandate of that statute to have permitted an amendment more than twenty days after the election stating a new ground of contest. It follows that *Harmon* v. *Tyler* and *State ex rel.* v. *Kivett* are not in point unless the amendment allowed by the Chancellor in the case at bar did state a new ground of contest.

Vaughan's amendment only purported to let the bill affirmatively recite that the grounds of contest already stated in that bill are being presented by Vaughan as relator in the name of the State. There was no change whatever in the grounds of contest relied upon, nor in the relief asked, it being stated in the bill as originally presented that this relief was asked "for the general welfare". At most, then, the amendment in question had only the effect of perfecting a statement in a cause of action previously stated in the bill. Controlling here is the holding in *Delaney* v. *Delaney,* 190 Tenn. 632, 231 S. W. (2d) 328, 332, " 'that an amendment changing capacity in which a plaintiff sues does not change the cause of action so as to let in the defense of limitation' ".

Contestee further insists that the Chancellor had no authority to allow the amendment. This insistence is predicated upon the fact that the remedy given a candidate for judge by Code, Section 2123 to contest the

election "does not confer jurisdiction upon the chancery court, as a court, but constitutes the chancellor a special tribunal to determine and hear the contest". *Barham* v. *Denison,* 159 Tenn. 226, 238, 17 S. W. (2d) 692, 696. The point sought to be made by contestee is that the Chancellor's only authority as such special tribunal is that expressly given by the enabling statute, Code, Sections 2123-2129. It is said this statute does not give the Chancellor authority to permit any kind of an amendment to the bill after the expiration of the twenty day limitation.

 The pertinent language of Code, Section 2123 is that "Should a candidate for the office of judge . . . desire to contest his election, he shall, within twenty days after such election, present a sworn statement of the grounds of contest to the chancellor". The right of a candidate, as such, in a judicial election to contest in his individual name such an election could hardly be stated in clearer language. So it was that in *Maloney* v. *Collier,* 112 Tenn. 78, 83 S. W. 667, and in *Barham* v. *Denison,* 159 Tenn. 226, 17 S. W. (2d) 692, the unsuccessful candidate for judge, proceeding under this Code section was permitted to contest that election in his individual name. In *Maloney* v. *Collier* the only relief sought was identical with the only relief sought in the case at bar, that relief being to have the election annulled. 112 Tenn. at page 101, 83 S. W. at page 667. Likewise in *Barham* v. *Denison* this relief was sought in the alternative. It was entertained by the Court without question of the right of the unsuccessful candidate to make the question.

There is no logical conclusion which can be reached from the very plain wording of Code, Section 2123 and from the holding in *Maloney* v. *Collier* and *Barham* v.

*Denison* other than the conclusion that Vaughan had the right as a candidate in his individual name to maintain this contest for the sole purpose of having the election annulled. It necessarily follows that it is immaterial whether the Chancellor had the authority to allow the amendment. Had he disallowed it, Vaughan's right to maintain the contest as originally presented continued to exist. It is here emphasized, however, that this disposition of the insistence being discussed is not to be construed as an implication that we think the Chancellor lacked the authority to permit the amendment. We simply are declining to decide that contention, because it is entirely immaterial to the disposition of the case.

It appears from the brief of contestee that the insistence they make with reference to this amendment and with reference to Vaughan's right to maintain this suit is probably due to an oversight on their part as to the distinction between Vaughan's right, on the one hand, and that of any other citizen, on the other hand. Contestee's brief says that Vaughan "instituted the suit as a citizen" and, therefore, has no right to maintain the contest in that he alleges no injuries to himself not common to all citizens. In support of that insistence contestee refers to *Patton* v. *City of Chattanooga,* 108 Tenn. 197, 65 S. W. 414; *Jared* v. *Fitzgerald,* 183 Tenn. 682, 195 S. W. (2d) 1; and *Skelton* v. *Barnett,* 190 Tenn. 70, 227 S. W. (2d) 774. Those cases do hold that a citizen alleging no injury not common to all citizens cannot maintain such a contest individually. These cases are not applicable here for the reason that Vaughan's right stems not merely from the fact that he is a citizen, but from the fact that he is a citizen that was a candidate for the office whose election he proposes to contest by reason of the

clear right which the Legislature elected to give him because he was a candidate under Code, Section 2123.

It is a fact that in *Skelton* v. *Barnett,* supra, contestant Skelton was a candidate for the office of Justice of the Peace. However, in his petition wherein he purports to contest the election of his successful opponent he affirmatively and positively asserts that he is not making that contest by reason of any right given to him as a candidate. 190 Tenn. at page 71, 227 S. W. (2d) 774. Thus, Skelton deliberately, presumably for some reason of his own, renounced any right which may be given to him as a candidate under the statute governing a contest with reference to the election of Justice of the Peace and proposed to prosecute that contest only as a citizen who had not been a candidate in that election. This, of course, brought him within the holding of *Patton* v. *City of Chattanooga,* and *Jared* v. *Fitzgerald,* supra, and made it necessary to dismiss his petition, since he alleged no injury not common to all other citizens.

It is also a fact that in *State ex rel. Davis* v. *Kivett,* the contestant Davis was an unsuccessful candidate for a judicial office and elected to prosecute the suit as relator in the name of the State. That fact, however, is no authority for the proposition that another candidate coming within Code, Section 2123 cannot exercise the right it clearly gives to proceed individually because he was a candidate, as was done in *Maloney* v. *Collier* and *Barham* v. *Denison,* and other cases carried in our official reports.

For the reasons stated, we must overrule all assignments of error with reference to the aforestated amendments allowed by the Chancellor or directed to the insistence that Vaughan cannot maintain this suit in his individual name because of failure to allege injuries to himself not common to all other citizens.

■ Therefore, the final question is whether the bill specifies grounds of contest sufficiently precise to withstand the demurrer asserting the absence of such sufficiency. It is to be kept in mind that this question is narrowed to the issue of whether contestant's ''specifications of fraud and illegality'', if proved to be true, ''are sufficient to render the result of the election 'incurably uncertain,' and necessitate our declaration that the entire election is void''. *State ex rel. Davis* v. *Kivett,* 180 Tenn. 598, 600, 177 S. W. (2d) 551.

There are many allegations of illegal acts and fraud said to have been committed by the Election Commissioners preceding the election in behalf of Hollis, and with him allegedly consenting to and participating therein, that are relevant at least as corroborative of the alleged specifically charged illegal and fraudulent acts. But they need not be discussed in detail here in considering the issue stated. They deal at length with the alleged appointment in an illegal manner of precinct election officials who allegedly would do the bidding of the Election Commissioners for the purpose of aiding in their allegedly declared plan ''to steal the election'' for Hollis and other candidates selected by them, and with the exclusion of other candidates, including Vaughan, or their watchers from the polling places or at the time of the counting of the ballots to the end that their alleged fraudulent acts might not be thwarted or detected; to the purchase of and payment for blocks of poll taxes by two of the Election Commissioners; the alleged printing of ballots for use in the election through unauthorized officials and in illegal form in order to omit from the ballot the names of two individuals allegedly nominated by recognized political parties as candidates, and at the same time to avoid disobedience of an injunction restrain-

ing them from printing such ballots without including thereon the names of these two particular individuals; the alleged gross violation of the law governing the registration of voters, and the allegedly complete ignoring of that law, particularly at the two Lawrenceburg precincts known as the City Hall and Court House precincts, where under the alleged planned manipulations of these Commissioners a total vote equal to more than 36% of the entire vote for this office was tallied as votes cast there. There are like allegations as to procuring alleged fictitious absentee ballots.

The bill asserts that the Election Commissioners have not filed any report of their canvass of said election returns with the county court clerk or any copy of the scroll and tallies as required by Code, Section 1992, et seq.; therefore, that the contestant is able to furnish the tabulation of the total votes as counted and returned for each of the candidates from records of a local newspaper "and other information available". It is then alleged that in the County Judge's race 7,907 votes were counted as having been voted; that 3,234 were counted for Hollis, and 2,146 for Vaughan, the remaining 2,527 being counted on a nearly equal basis between the two other candidates. According to this tabulation Hollis has a majority of 1,088 over Vaughan.

The bill names 349 persons who allegedly voted illegally at one or the other of the thirty precincts, excluding the two aforesaid Lawrenceburg precincts. The particular disqualification of each of these voters is specified, as is the precinct at which each is said to have voted. Included in this list are 163 allegedly illegal or illegally counted absentee ballots. It is alleged that all 349 of these votes were counted for Hollis.

One charge is that the Commissioners' plan was "to use as many illegal and fraudulent absentee ballots as necessary—for the election of the defendant Ray Hollis to the office of County Judge" and that to this end the commissioners had printed 3,000 absentee ballots "for use in said election", though the "total number of legal absentee voters entitled to vote as such in Lawrence County would not and could not exceed four hundred in number".

It is then alleged that the commissioners or their agents procured the notary seal of a person named J. F. Springer, purporting to be a notary public of Hickman County "and on the greater majority of the absentee voucher envelopes" "had this notary seal impressed on said voucher envelopes" with the purported signature of Springer as "notary at large"; that there was no such notary at large; that the only commission as a notary public issued to a J. F. Springer is a man who was commissioned a notary public for Hickman County in 1936, and who died in 1939; that the signature of Springer on the "voucher envelopes" "is an absolute forgery".

According to the bill, when all the ballot boxes were sought to be impounded the two aforementioned boxes at the Court House and City Hall, respectively, could not be found, and have not yet been found. The tabulation above mentioned shows that 2,870 ballots for county judge were reported as being voted in those two precincts, the vote being nearly even in each precinct, and that 1,439 of these were counted for Hollis and 527 for Vaughan, there being counted 234 votes for the other two candidates. It will be noted that according to this tabulation the majority of Hollis over Vaughan in these two precincts is 912. His total majority, according to the tabulation mentioned, including the 912 majority at

these two precincts, was tabulated as being 1,088, and this includes the specifically identified 349 votes in the country precincts alleged for the various reasons stated to have been illegal, and alleged to have been voted for Hollis.

It is alleged that the agents of the Election Commissioners refused to permit any watcher to be present at the Court House polling place and only one at the City Hall; that one of the Election Commissioners "took over" during the polling of the votes at the Court House precinct and supervised and directed the conduct of the election there, and was present when the counting of the ballots was completed and the tallies totalled; that Hollis was stationed as a guard at one entrance to this room and the brother-in-law of this Commissioner at another, with the remaining two entrances nailed from the inside; that they would not permit Vaughan or other candidates not supported by the Commissioner, "to be present during the polling of the votes and counting of the ballots— till near the close of the counting" except a candidate for sheriff named Davis who was acting as a substitute judge during the counting of the ballots, it being alleged that these commissioners at the close of the polls deserted the candidate for sheriff whom they had been supporting as the result of an alleged "deal" said to have been made with Davis in order to carry out their alleged plan of voting and counting illegal absentee ballots at the Court House and City Hall precincts.

It is stated in the bill that during the course of counting the ballots at the Court House precinct the ballot boxes from the country precincts were passed through a window into the room to this Election Commissioner, and that he opened these boxes and removed unopened voucher envelopes of absentee ballots and empty voucher

envelopes and had them voted and placed in the Court House ballot box, and that in several instances such absentee ballots were voted without the name of the voter being entered on the scrolls.

It is alleged that when the count of the ballots had been concluded at the Court House precinct the ballot box there with its contents was left with this commissioner in that room, and shortly thereafter was removed "surreptitiously", this commissioner, so it is alleged, being in the room at the time of such removal. As aforesaid, the effort to impound that ballot box failed because the box cannot be found.

It is alleged that at the City Hall precinct a brother of the aforesaid commissioner was receiver and "ran" the election; that this brother refused to permit Vaughan or other nominees not supported by the commission, or their watchers, to be present during the counting of the ballots except the aforesaid candidate for sheriff, Sam Davis, and one other candidate.

It is alleged that at this precinct and at the Court House precinct people were allowed to vote without regard to whether they were legal voters, and that many illegal votes were cast at both places.

The bill alleges that at the conclusion of the counting of ballots at this City Hall precinct this brother of said commissioner "and another removed from the polling places two metal ballot boxes containing the election records of said precinct and later returned one of such ballot boxes, containing only what purported to be a tally thereof". The efforts to impound this ballot box and the election records of that precinct failed because, so it is alleged, they cannot be found.

It is further alleged in the bill with reference to the City Hall and Court House precincts that: "More than

one thousand fraudulent and illegal absentee ballots were placed in the ballot boxes, about four to five hundred of such fraudulent and illegal absentee ballots being deposited in said ballot box at the city hall precinct, and over five hundred of such fraudulent and illegal absentee ballots being deposited in the said ballot box at the courthouse precinct, all of such absentee ballots having been altered and changed so as to show that same were voted for candidates supported by the defendants Commissioners of Election, including said candidate defendant Ray Hollis, and the large majority of same being offered for voting by and/or for persons not qualified as voters and/or to vote such absentee ballots at such voting precincts or elsewhere, and the ballots cast at both of said voting precincts were incorrectly counted, the same in many instances being counted for defendant Ray Hollis and other candidates supported by said defendants Commissioners of Election, regardless of them being actually marked for other candidates, and in fact, it is charged that the whole object and purpose of the defendants Election Commissioners, and the precinct election officials at said courthouse and city hall precincts, were to 'count into office' at said precincts the defendant Ray Hollis, and other candidates supported by said defendants Commissioners of Election, and, as said defendants and their advisers and spokesman had boasted 'steal the election' for such candidates, and such was actually done, although, upon a fair count of the legal votes so cast in said election and especially at said courthouse and city hall precincts, said defendant Ray Hollis and said other candidates supported by defendants Commissioners of Election did not receive a plurality or majority of the votes at such election''.

In determining whether the specific charges of fraud and irregularity in this bill are sufficient to withstand the demurrer asserting the contrary, we must, of course, proceed upon the assumption that the charges contained in the bill are true. Keeping that in mind, the question we finally have here is identical with that stated in *State ex rel. Davis* v. *Kivett,* 180 Tenn. 598, 600, 177 S. W. (2d) 551, in this language: ''Complainant seeks to have the entire election declared void because his specific charges of fraud and irregularity in the election affect a sufficient number of voting precincts to have changed the result of the election if all the voters in those precincts had voted one way. He does not insist that he would have been elected had the illegal votes been eliminated and the votes purged, but that his specifications of fraud and illegality in the election are sufficient to render the result of the election 'incurably uncertain,' and necessitate our declaration that the entire election is void.''

The specific charges of fraud and irregularity in the election in *State ex rel. Davis* v. *Kivett,* those charges having been found to be true, were held to require that the election in that case can be annulled. The charges of fraud and irregularity made in the bill in that case are set out in some detail in the opinion 180 Tenn. on pages 601-602, 177 S. W. (2d) on page 551. Anyone who cares to make a comparison will see that the charges of fraud and irregularity in that case are practically identical with many of those contained in the instant case, and must conclude that the charges in the instant case are perhaps more precisely made than in the Kivett case, particularly in the present case with reference to the aforesaid Court House and City Hall precincts where the

tabulated vote was more than 36% of the entire vote cast.

The Kivett case is probably the latest expression of this Court upon the sufficiency of the charges to withstand a demurrer directed to the merits of the bill. The question was discussed in *Maloney* v. *Collier*, 112 Tenn. 78, 83 S. W. 667. This Court in that case in its discussion of the precision with which the facts must be set forth in the bill said this: "In *Mann* v. *Cassidy* [1 Brewst. 11], it was held that the petition must state the facts distinctly; that it must charge an undue election and false returns; that it must show the figures returned for each candidate; that it must also show the votes which were received by each; and then specify the divisions—that is, voting precincts—in which the votes were illegally received, the manner in which the fraud was effected, and the number of votes fraudulently received". 112 Tenn. at page 105, 83 S. W. at page 674. There is no escape from the fact that the charges in the present bill fully meet what is stated to be the test in the above quotation, and that, if proved to be true, vitiate entirely at least the vote cast at the two Lawrenceburg precincts. This fact viewed in that aspect most favorable to contestee necessarily would render the result of the election "incurably uncertain"; hence, invalid. *Nelson* v. *Sneed*, 112 Tenn. 36, 53, 83 S. W. 786.

It results that the decree of the Chancellor overruling the demurrer was correct and that the insistence of the appellants to the contrary must be rejected.

The decree of the Chancellor will be affirmed with cost of the appeal adjudged against the appellants and their sureties. The cause will be remanded for further appropriate proceedings.

All concur.